[No. S054561. Aug. 2, 1999.]

OSCAR AGUILAR et al., Plaintiffs and Respondents, v.
AVIS RENT A CAR SYSTEM, INC., et al., Defendants and Appellants.

124

**COUNSEL**

McKenna & Cuneo, Curiale Dellaverson Hirschfeld Kelly & Kraemer, Joanne Dellaverson, Joel P. Kelly, Donna M. Rutter, John F. Baum and Thomas A. Myers for Defendants and Appellants.

Bruce Adelstein; Michael E. Rosman and Hans F. Bader for the National Writers Union, the Reason Foundation, the Libertarian Law Council and the Center for Individual Rights as Amici Curiae on behalf of Defendants and Appellants.

J. Joshua Wheeler for the Thomas Jefferson Center for the Protection of Free Expression as Amicus Curiae on behalf of Defendants and Appellants.

Bronson, Bronson & McKinnon, Edwin L. Currey, Jr., Albert P. Bedecarre, Mary Bossart Halfpenny, Adam M. Dodek; La Raza Centro Legal and Renee Saucedo for Plaintiffs and Respondents.

Margaret C. Crosby, Ann Brick and Edward M. Chen for American Civil Liberties Union of Northern California as Amicus Curiae on behalf of Plaintiffs and Respondents.

Morrison & Foerster, William Alsup; Patricia A. Shiu, Jennifer Middleton, Claudia Center and Elizabeth Letcher for the Employment Law Center as Amicus Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

**GEORGE, C. J.**—A jury found that defendants had engaged in employment discrimination, in part by permitting plaintiffs to be the target of racial epithets repeatedly spoken by a fellow employee. In addition to awarding damages, the trial court issued an injunction prohibiting the offending employee from using such epithets in the future. Defendants argue that such an injunction constitutes a prior restraint that violates their constitutional right to freedom of speech. For the reasons that follow, we hold that a remedial injunction prohibiting the continued use of racial epithets in the workplace does not violate the right to freedom of speech if there has been a judicial determination that the use of such epithets will contribute to the continuation of a hostile or abusive work environment and therefore will constitute employment discrimination.

## I

The present appeal is from a judgment awarding damages and injunctive relief. Defendants have not provided a reporter's transcript of the trial proceedings, and have elected to proceed by means of an appendix in lieu of a clerk's transcript. We glean the following from this rather limited record.

In a first amended complaint dated April 26, 1993, 17 Latino employees of Avis Rent A Car System, Inc., sued Avis and 10 named individuals, alleging causes of action for employment discrimination in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.),[1] wrongful discharge in violation of public policy, intentional infliction of emotional distress, and negligent infliction of emotional distress.

The complaint alleged that plaintiffs were employed by Avis as "drivers," at its San Francisco airport facility, to move Avis vehicles among parking lots and from one airport location to another. Defendant John Lawrence was "the service station manager at the SFO AVIS location and was authorized to direct and control the drivers." The complaint alleged that Lawrence "verbally harassed [plaintiffs] constantly. He routinely called *only* the Latino drivers 'motherfuckers' and other derogatory names, and continually demeaned them on the basis of their race, national origin and lack of English language skills." (Italics in original.) Defendant Kathy Black was alleged to have conducted a discriminatory investigation into the suspected theft of a calculator from a rental vehicle, detaining and questioning only Latino employees. In the course of this inquiry, a police officer was summoned and

---

[1] All further statutory references are to the Government Code, unless otherwise specified.

plaintiffs were told that the Immigration and Naturalization Service would be called if they did not cooperate. The calculator was found the following day, and Black apologized to plaintiffs.

On October 27, 1994, the jury returned special verdicts, finding as follows: Plaintiffs Ramiro Hernandez, German Lazo, Oswaldo Ramirez, Carlos Reyes, and Mario Serrano were harassed or discriminated against by a supervisor, Black. Each of these plaintiffs was awarded damages in the amount of $15,000. Plaintiffs Pedro Mojica and Orlando Peraza were harassed or discriminated against by Black and Lawrence. Avis knew or should have known of Lawrence's conduct with respect to these employees and took no action. Mojica and Peraza each was awarded damages in the amount of $25,000. Plaintiff Marcos Recinos was harassed or discriminated against by Black and Lawrence, but Avis did not know, nor should it have known, about Lawrence's conduct with respect to him. Recinos was awarded damages in the amount $25,000. Plaintiff Miguel Fonseca was harassed or discriminated against by Lawrence. Avis knew or should have known of Lawrence's conduct with respect to Fonseca and took no action, but Fonseca did not suffer severe emotional distress, and the jury awarded no damages.

On December 15, 1994, a hearing was held to consider plaintiffs' request for injunctive relief. Defendants argued there was no evidence of ongoing harm, nor any danger of ongoing harm, and the court responded: "Well, there was evidence presented sufficient for the jury to find that . . . as to four plaintiffs who were working there, all of whom had a common characteristic, that is, that they were Latinos or members of Hispanic Latino racial ancestry, Lawrence had engaged in acts of harassment so continual and severe as to alter the working conditions for those people there, because that was the statutory test; [¶] Secondly, that Avis knew or should have known of that harassment. It may be that the bringing of the action at the Department of Fair Employment and Housing and the action here had a chilling effect on the harassment. But I want to make sure that that chilling effect survives the end of this process."

The court further stated during the hearing: "Well, the court is making a finding of fact based on evidence observed during the trial, that based on the evidence showing harassment and discrimination to the extent already commented on by Mr. Lawrence, there's a substantial likelihood based on his actions that he will do so in the future unless restrained."

On February 14, 1995, the court entered judgment awarding damages against Avis in the amount of $15,000 each to Hernandez, Lazo, Ramirez, Reyes, and Serrano, and damages against Avis and Lawrence jointly and

severally in the amount of $25,000 each to Mojica, Peraza, and Recinos. The court also issued an injunction that stated as follows: "Defendant John Lawrence shall cease and desist from using any derogatory racial or ethnic epithets directed at, or descriptive of, Hispanic/Latino employees of Avis Rent A Car System, Inc., and shall further refrain from any uninvited intentional touching of said Hispanic/Latino employees, as long as he is employed by Avis Rent A Car System, Inc., in California. [¶] Defendant Avis Rent A Car System, Inc. shall cease and desist from allowing defendant John Lawrence to commit any of the acts described in [the above quoted paragraph], under circumstances in which it knew or should have known of such acts; and shall further not investigate or permit investigations regarding breaches of its employment rules or practices when such investigations are limited to subjects or targets who are Hispanic/Latino employees of said defendant, unless the circumstances are such that no employees other than Hispanic/Latinos are reasonably subjects or targets of such investigation(s)."

The injunction further ordered Avis to post certain notices advising employees to report any instances of discriminatory or harassing conduct by Avis or its employees and to "publish a policy statement in English and Spanish delineating employee rights and manager responsibilities with regard to employee complaints of racial or national origin harassment or discrimination . . . ."

Defendants appealed "from the mandatory and prohibitory injunction portion of the Judgment," providing the Court of Appeal with the reporter's transcript of the posttrial hearing at which the injunction was issued, but not providing the court with a reporter's transcript of the trial proceedings. Defendants further elected to prepare an appellants' appendix in lieu of a clerk's transcript.

The Court of Appeal concluded "that to the extent the injunction prohibits Lawrence from continuing to use racist epithets in the workplace it is constitutionally sound, but to the extent it reaches beyond the workplace it improperly exceeds the scope of the FEHA violation sought to be prevented and must be modified accordingly." The Court of Appeal reversed the injunctive portion of the judgment and remanded the case to the trial court with directions to "redraft the injunction in a manner that . . . limits its scope to the workplace." In response to defendants' argument that the injunction's prohibition of the use of "derogatory racial or ethnic epithets" was vague, the Court of Appeal further ordered the trial court to add "an exemplary list of prohibited derogatory racial or ethnic epithets, specifying epithets such as those actually used in the workplace by Lawrence" in order to "more precisely warn Lawrence and Avis what is forbidden." Plaintiffs

have not challenged the Court of Appeal's restriction of the terms of the injunction, but Avis and Lawrence sought review of that court's decision, arguing that the injunction, even as limited by the Court of Appeal, constitutes an improper prior restraint of freedom of expression. We granted review to address this question.

## II

The FEHA declares "as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or age." (§ 12920.) "This court has declared that policy to be 'fundamental.' " (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 485 [208 Cal.Rptr. 724, 691 P.2d 272].) "Employment discrimination 'foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general.' (§ 12920.) The express purpose of the FEHA is 'to provide effective remedies which will eliminate such discriminatory practices.' (*Ibid.*) In addition, the Legislature has directed that the FEHA is to be construed 'liberally' so as to accomplish its purposes. (§ 12993.)" (*Brown v. Superior Court, supra,* 37 Cal.3d at p. 486.)

One form of employment discrimination is harassment on the basis of race or national origin. Section 12940, subdivision (h)(1), states that it is unlawful "[f]or an employer . . . or any other person, because of race . . . [or] national origin . . . to harass an employee or applicant. Harassment of an employee or applicant by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."[2] California Code of Regulations, title 2, section 7287.6, subdivision (b)(1)(A), defines harassment to include "[v]erbal harassment, e.g., epithets, derogatory comments or slurs on a basis enumerated in the Act."

Verbal harassment in the workplace also may constitute employment discrimination under title VII of the Civil Rights Act of 1964 (42 U.S.C.

---

[2]Avis and Lawrence move to augment the record on appeal with a document entitled "Jury Instruction No. 23" that states, in pertinent part, that "John Lawrence is not a supervisor of Avis." Plaintiffs object on the ground, among others, that this motion is untimely. We deny the motion to augment the record, but observe that it does not appear from the special verdicts that the jury found that Lawrence was a "supervisor" of plaintiffs within the meaning of section 12940, subdivision (h)(1).

§ 2000e et seq.; Title VII), the federal counterpart of the FEHA. (*Meritor Savings Bank* v. *Vinson* (1986) 477 U.S. 57 [106 S.Ct. 2399, 91 L.Ed.2d 49]; *Beyda* v. *City of Los Angeles* (1998) 65 Cal.App.4th 511, 517 [76 Cal.Rptr.2d 547] [Title VII cases may be considered in interpreting the FEHA].) Explaining the potentially debilitating effects of this form of employment discrimination, the United States Supreme Court has observed: "A discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." (*Harris* v. *Forklift Systems, Inc.* (1993) 510 U.S. 17, 22 [114 S.Ct. 367, 370-371, 126 L.Ed.2d 295]; *Davis* v. *Monsanto Chemical Co.* (6th Cir. 1988) 858 F.2d 345, 349.)

Of course, not every utterance of a racial slur in the workplace violates the FEHA or Title VII. As the United States Supreme Court has recognized in the context of sexual harassment: "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII. [Citations.] For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' [Citation.]" (*Meritor Savings Bank* v. *Vinson, supra,* 477 U.S. 57, 67 [106 S.Ct. 2399, 2405.) The high court reaffirmed this standard in *Harris* v. *Forklift Systems, Inc., supra,* 510 U.S. 17, 21-22 [114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302]: "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." Recently, the high court observed that it had "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . ." (*Faragher* v. *City of Boca Raton* (1998) 524 U.S. 775, 788 [118 S.Ct. 2275, 2284, 141 L.Ed.2d 662, 677].)

California courts have adopted the same standard in evaluating claims under the FEHA. In rejecting an FEHA claim that alleged acts of sexual harassment directed toward other women had created a hostile work environment for the plaintiff, the Court of Appeal in *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590 [262 Cal.Rptr. 842] held that the harassment complained of must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment . . . ." (*Id.* at p. 608.) "The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a

reasonable employee and that she was actually offended." (*Id.* at pp. 609-610, fn. omitted.) "[H]arassment cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature. [Citation.]" (*Id.* at p. 610.)

In the present case, Avis and Lawrence do not contest the validity of that portion of the judgment awarding monetary damages against them. They concede that the jury's findings that they violated the FEHA are supported by substantial evidence and they do not claim that the damage award violates the First Amendment. For purposes of this case, therefore, it is established that Lawrence's conduct created a hostile or abusive work environment for plaintiffs on the basis of race, and that Avis properly was held liable for knowingly failing to prevent this misconduct by Lawrence.[3] (See *Matthews v. Superior Court* (1995) 34 Cal.App.4th 598, 603-604 [40 Cal.Rptr.2d 350]; *Page v. Superior Court* (1995) 31 Cal.App.4th 1206, 1210 [37 Cal.Rptr.2d 529].)

III

■ Avis and Lawrence challenge only that portion of the judgment awarding injunctive relief. It is beyond question that, in general, both the Department of Fair Employment and Housing and courts enforcing the FEHA are empowered not only to redress past instances of employment discrimination, but to prevent a recurrence of such misconduct. Section 12920 states that the purpose of the FEHA is "to provide effective remedies which will eliminate" employment discrimination. Section 12920.5 adds: "In order to eliminate discrimination, it is necessary to provide effective remedies that will both prevent and deter unlawful employment practices and redress the adverse effects of those practices on aggrieved persons." Accordingly, if the Fair Employment and Housing Commission finds that an employer has engaged in an unlawful practice, it may order the employer "to cease and desist from the unlawful practice." (§ 12970, subd. (a).) Further, the Commission may order "[a]ffirmative or prospective relief to prevent the recurrence of the unlawful practice." (§ 12970, subd. (a)(5).) Similarly,

---

[3]The question whether, and to what extent, the regulation of speech that constitutes racial or sexual harassment may violate the First Amendment has been the subject of scholarly debate. (Compare Browne, *Title VII as Censorship: Hostile-Environment Harassment and the First Amendment* (1991) 52 Ohio St. L.J. 481 and Gerard, *The First Amendment in a Hostile Environment: A Primer on Free Speech and Sexual Harassment* (1993) 68 Notre Dame L.Rev. 1003, with Comment, *Freedom of Speech and Workplace Harassment* (1992) 39 UCLA L.Rev. 1791 and Sangree, *Title VII Prohibitions Against Hostile Environment Sexual Harassment and the First Amendment: No Collision in Sight* (1995) 47 Rutgers L.Rev. 461.) Because defendants have not challenged the finding that their past conduct amounted to unlawful employment discrimination in violation of the FEHA, we need not, and do not, address that broad issue here.

courts can, and often do, issue injunctions prohibiting the recurrence or continuation of employment discrimination. We have held "that, in a civil action under the FEHA, all relief generally available in noncontractual actions . . . may be obtained." (*Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 221 [185 Cal.Rptr. 270, 649 P.2d 912].) This includes injunctive relief. (*Snipes* v. *City of Bakersfield* (1983) 145 Cal.App.3d 861, 869-870 [193 Cal.Rptr. 760].)

■ Avis and Lawrence argue initially that the injunction was unnecessary, because the record does not demonstrate that "Lawrence used words that are constitutionally proscribable." As noted above, the jury determined that Lawrence's conduct violated the FEHA, and defendants concede that this finding is supported by substantial evidence. The record before this court does not reveal the precise words used by Lawrence, because defendants elected not to provide a reporter's transcript of the trial proceedings. We reject defendants' claim, therefore, because they failed to provide this court with a record adequate to evaluate this contention. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 574-575 [224 Cal.Rptr. 664, 715 P.2d 624].)

Defendants also argue that the injunction was unnecessary because the record does not demonstrate that Lawrence "engaged in ongoing conduct that arguably might justify injunctive relief." The trial court found to the contrary, stating: "[T]he court is making a finding of fact based on evidence observed during the trial, that based on the evidence showing harassment and discrimination to the extent already commented on by Mr. Lawrence, there's a substantial likelihood based on his actions that he will do so in the future unless restrained." In order to prevail on this claim, defendants must show that this finding is not supported by substantial evidence. But, as noted above, defendants elected not to provide a reporter's transcript of the trial proceedings. Accordingly, they have no basis upon which to argue that the evidence adduced at trial was insufficient to support the trial court's finding that injunctive relief was necessary to prevent a continuation of defendants' unlawful conduct.

Defendants claim we must conclude that injunctive relief is unnecessary, because it appears from the trial court's comments that Lawrence had ceased his unlawful conduct during the pendency of the present proceedings. The trial court rejected this contention, observing that "[i]t may be that the bringing of the action at the Department of Fair Employment and Housing and the action here had a chilling effect on the harassment," and finding that "based on the evidence showing harassment and discrimination [by Mr. Lawrence] to the extent already commented on . . . , there's a substantial likelihood based on his actions that he will do so in the future unless

restrained." The trial court did not err in so ruling. The mere fact that a defendant refrains from unlawful conduct during the pendency of a lawsuit does not necessarily preclude the trial court from issuing injunctive relief to prevent a posttrial continuation of the unlawful conduct.

"[M]any courts have rejected arguments against injunctive relief where defendants changed their practices only in response to being sued." (2 Lindemann, Employment Discrimination Law (3d ed. 1996) ch. 40, p. 1748, fn. omitted.) "Generally, a person subjected to employment discrimination is entitled to an injunction against future discrimination, [citation], unless the employer proves it is unlikely to repeat the practice, [citations]. . . . An employer that takes curative actions only after it has been sued fails to provide sufficient assurances that it will not repeat the violation to justify denying an injunction." (*E.E.O.C.* v. *Goodyear Aerospace Corp.* (9th Cir. 1989) 813 F.2d 1539, 1544 17; *EEOC* v. *Frank's Nursery & Crafts, Inc.* (6th Cir. 1999) 177 F.3d 448, 467 ["upon a finding of any intentional employment discrimination, a district court possesses broad discretion to craft an injunction that will ensure the employer's compliance with the law"]; *Dombeck* v. *Milwaukee Valve Co.* (7th Cir. 1994) 40 F.3d 230, 238 [injunction proper although harasser and victim had been reassigned to different work areas]; *U.S. E.E.O.C.* v. *Gurnee Inn Corp.* (7th Cir. 1990) 914 F.2d 815, 817 [injunction prohibiting future sexual harassment proper although the employment of the sole harasser had been terminated]; cf. *Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 929 [130 Cal.Rptr. 1, 549 P.2d 833] [" '[T]he voluntary discontinuance of alleged illegal practices does not remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges where by the mere volition of a party the challenged practices may be resumed.' [Citation.]"].)

## IV

 ██ Avis and Lawrence further claim that the injunction is invalid because it is a prior restraint that violates their rights to free speech guaranteed by the First Amendment to the federal Constitution, and article I, section 2, of the California Constitution. We first consider defendants' claims under the federal Constitution.

## A.

The First Amendment to the United States Constitution states: "Congress shall make no law . . . abridging the freedom of speech . . . ." This fundamental right to free speech applies to the states through the Fourteenth

Amendment's due process clause. (*Gitlow* v. *New York* (1925) 268 U.S. 652, 666 [45 S.Ct.625, 630, 69 L.Ed.2d 1138].)

 ■ Although stated in broad terms, the right to free speech is not absolute. (*Near* v. *Minnesota* (1931) 283 U.S. 697, 708 [51 S.Ct. 625, 628, 75 L.Ed. 1357] ["Liberty of speech and of the press is also not an absolute right, and the state may punish its abuse. *Whitney* v. *California* [(1927) 274 U.S. 357 [47 S.Ct. 641, 71 L.Ed. 1095]]; *Stromberg* v. *California* [(1931) 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed.2d 1117]]."].) Many crimes can consist solely of spoken words, such as soliciting a bribe (Pen. Code, § 653f), perjury (Pen. Code, § 118), or making a terrorist threat (Pen. Code, § 422). As we stated in *In re M.S.* (1995) 10 Cal.4th 698, 710 [42 Cal.Rptr.2d 355, 896 P.2d 1365]: "[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations.] In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is, ' "communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . ." ' [Citations.]" (See also *NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 916 [102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215]; *Drivers Union* v. *Meadowmoor Co.* (1941) 312 U.S. 287, 292, 295 [61 S.Ct. 552, 554-556, 85 L.Ed. 836, 132 A.L.R. 1200]; Fallon, *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark* (1994) 1994 Sup. Ct. Rev. 1, 13.) Civil wrongs also may consist solely of spoken words, such as slander and intentional infliction of emotional distress. A statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity. (*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 628 [104 S.Ct. 3244, 3255, 82 L.Ed.2d 462] ["[A]cts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent— wholly apart from the point of view such conduct may transmit. Accordingly, like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, such practices are entitled to no constitutional protection."].)

This reasoning applies equally when spoken words, either alone or in conjunction with conduct, amount to employment discrimination. As already noted, the United States Supreme Court has held that the use of racial epithets that is sufficiently severe or pervasive constitutes "employment discrimination" in violation of Title VII (*Harris* v. *Forklift Systems, Inc.,*

*supra*, 510 U.S. 17; *Meritor Savings Bank* v. *Vinson, supra*, 477 U.S. 57), and these decisions are at least implicitly inconsistent with any suggestion that speech of this nature is constitutionally protected. ▮▮▮ Furthermore, in *R.A.V.* v. *St. Paul* (1992) 505 U.S. 377, 389 [112 S.Ct. 2538, 2546, 120 L.Ed.2d 305], the high court made this point explicit in discussing certain circumstances in which spoken words are not constitutionally protected, stating: "[S]ince words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets) . . . speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech. [Citations.] Thus, for example, sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices, [citations]." (See also *Wisconsin* v. *Mitchell* (1993) 508 U.S. 476, 487 [113 S.Ct. 2194, 2200, 124 L.Ed.2d 436].)[4]

Justice Werdegar's concurring opinion asserts that we fail to "address . . . a critical preliminary question, that is, whether the First Amendment permits imposition of civil liability under FEHA for pure speech that creates a racially hostile or abusive work environment," and asserts that this issue takes us "into uncharted First Amendment waters." (Conc. opn. of Werdegar, J., *post*, at pp. 147-148.) To the contrary, as noted above, we conclude that it is clear from the high court's decisions in *Harris, Meritor,* and *R.A.V.*, that the First Amendment permits imposition of civil liability for past instances of pure speech that create a hostile work environment. Defendants do not argue otherwise. The sole issue in the present case is whether the First Amendment also permits the issuance of an injunction to prohibit the continuation of such discriminatory actions.

---

[4]Relying upon the decision in *R.A.V.* v. *St. Paul, supra*, 505 U.S. 377, the Court of Appeal in the present case upheld the injunction because it was aimed at the "secondary effects" of Lawrence's use of racial epithets. We do not agree that the "secondary effects" doctrine applies in the present case. In *Boos* v. *Barry* (1988) 485 U.S. 312 [108 S.Ct. 1157, 99 L.Ed.2d 333], the high court held that a Washington, D.C., ordinance prohibiting the display of any sign within 500 feet of a foreign embassy if that sign tends to bring that foreign government into "public odium" or "public disrepute" was an impermissible content-based restriction of speech, not a permissible content-neutral regulation of conduct aimed only at the secondary effects of speech. The court stated: "The emotive impact of speech on its audience is not a 'secondary effect.' " (*Id.* at p. 321 [108 S.Ct. at p. 1163].) Similarly, in the present case, the effects of Lawrence's use of racial epithets on plaintiffs is not a "secondary effect." (Fallon, *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark, supra*, 1994 Sup. Ct. Rev. 1, 17 ["Despite occasional suggestions to the contrary prohibitions against sexual harassment cannot be justified on the rationale that creation of a hostile environment is a prohibitable secondary effect."]; (Sangree, *Title VII Prohibitions Against Hostile Environment Sexual Harassment and the First Amendment: No Collision in Sight, supra*, 47 Rutgers L.Rev. 461, 511, fn. 215.)

It is not surprising that defendants concede that the First Amendment permits the imposition of civil liability for pure speech that violates the FEHA, because the high court's opinions, discussed above, leave little room for doubt on this score. As noted above, in *R.A.V.* v. *St. Paul, supra,* 505 U.S. 377, 389 [112 S.Ct. 2538, 2546], the high court demonstrated its point that some forms of pure speech are not constitutionally protected, by observing that words "may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." One commentator observed: "When the majority and concurring opinions are viewed in conjunction, it appears that all nine Justices participating in *R.A.V.* assumed that the core Title VII prohibition against speech that creates a discriminatorily hostile work environment would pass constitutional muster. *Harris,* coming less than two years after the decision in *R.A.V.,* buttresses this impression." (Fallon, *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark, supra,* 1994 Sup. Ct. Rev. 1, 12.) Like Professor Fallon, we do not find the message of *R.A.V., Harris,* and *Meritor* nearly as opaque as suggested in the concurring opinion.[5]

---

[5]The concurring opinion cites several law review articles for the proposition that "the question [whether the First Amendment permits imposition of civil liability for pure speech that creates a hostile work environment] is one of considerable debate among First Amendment scholars" (conc. opn. of Werdegar, J., *post,* at p. 148, fn. omitted), but the controversy reflected in the cited articles has a different focus. Although there is considerable academic debate concerning *the extent to which* sexually and racially discriminatory speech may be regulated, consistent with the First Amendment, with a single exception every scholar cited by the concurring opinion agrees that, in some circumstances, pure speech that violates Title VII is not protected by the First Amendment.

Professor Sangree believes "that hostile environment law passes First Amendment scrutiny" and "concludes that while debate concerning the parameters of protected speech and unlawful discrimination can clarify why hostile environments are prohibitable, Title VII protections should not be curtailed." (Sangree, *Title VII Prohibitions Against Hostile Environment Sexual Harassment and the First Amendment: No Collision in Sight, supra,* 47 Rutgers L.Rev. 461, 465, 479.) Professor Strauss discusses at length the extent to which "sexist speech" in the workplace is protected by the First Amendment, but has no difficulty concluding that speech that violates Title VII is not protected: "Once the plaintiff alleges a cause of action under Title VII, and demonstrates a discriminatory intent or effect, the employer cannot successfully defend on first amendment grounds." (Strauss, *Sexist Speech in the Workplace* (1990) 25 Harv. C.R.-C.L. L.Rev. 1, 43.) Professor Volokh concludes that only the prohibition of "undirected" speech that contributes to the creation of a hostile work environment would offend the First Amendment: "Liability could be imposed not for any speech that creates a hostile work environment, but only for speech that the speaker knows is offensive, that is directed at an employee because of her race, sex, religion, or national origin, and creates (together with whatever other nonspeech conduct might be present) a hostile work environment." (Comment, *Freedom of Speech and Workplace Harassment, supra,* 39 UCLA L.Rev. 1791, 1846, fn. omitted.) Professor Fallon states: "After Harris . . . it is virtually inconceivable that the Supreme Court might hold that the First Amendment forbids the imposition of Title VII liability for a broad category of sexually harassing speech. Some trimming of the cause of action remains possible, but it is highly unlikely that workplace expressions of gender-based hostility and communications of explicitly sexual messages will

The concurring opinion ultimately agrees that speech that violates Title VII by permeating the workplace with " 'discriminatory intimidation, ridicule, and insult,' [citation], that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create[] an abusive work environment,' [citation]" (*Harris* v. *Forklift Systems, Inc., supra,* 510 U.S. 17, 21 [114 S.Ct. 367, 370]) is not protected by the First Amendment, but the concurring opinion reaches this conclusion primarily by weaving together "strands of analysis" from several areas of First Amendment jurisprudence. (Conc. opn. of Werdegar, J., *post,* at pp. 148, 154.) We find such efforts unnecessary in light of the rulings of the United States Supreme Court in *Harris, supra,* and *Meritor Savings Bank* v. *Vinson, supra,* 477 U.S. 57, and the statement in *R.A.V.* v. *St. Paul, supra,* 505 U.S. 377, that harassing speech that is sufficiently severe or pervasive to constitute employment discrimination is not constitutionally protected.[6]

---

receive categorical protection." (Fallon, *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark, supra,* 1994 Sup. Ct. Rev. 1, 9.) Professor Gerard, although arguing that the federal guidelines implementing Title VII's prohibition of sexual harassment are unconstitutionally overbroad, states: "Various forms of pure speech are also unprotected; the sexual solicitation, the false and defamatory statement of fact, and the display of obscene graphics. These are some of the worst abuses and can be eliminated without hindrance." (Gerard, *The First Amendment in a Hostile Environment: A Primer on Free Speech and Sexual Harassment, supra,* 68 Notre Dame L.Rev. 1003, 1034.) Professor Gerard also questions whether "profane and vulgar words" could be prohibited. (*Id.* at p. 1035.) Only Professor Browne argues that the First Amendment prohibits all violations of Title VII based primarily on speech. (Browne, *Title VII as Censorship; Hostile-Environment Harassment and the First Amendment, supra,* 52 Ohio St. L.J. 481.)

As explained above, in this case we have no occasion to address the issue on which these commentators are divided, because defendants have not provided a record that discloses the precise nature or extent of the racial epithets and insults that were found by the jury to have created a racially abusive working environment, and because defendants do not contend that the past racial epithets and insults, found by the jury, comprise constitutionally protected speech for which no damage award may be imposed. None of the cited law review articles specifically address the much narrower issue presented by this case, namely whether, once it has been judicially determined that a racially abusive working environment has been created by pervasive racial epithets and insults, a court may enjoin the offending employee from uttering similar racial epithets in the future that will perpetuate the discriminatory abusive environment.

[6]Justice Brown's dissenting opinion quotes numerous decisions that eloquently explicate the unquestioned proposition that the First Amendment protects the expression of ideas that are reviled as well as those that are revered. But just as it is perfectly clear that the First Amendment does not protect an individual's right to commit treason (or, for that matter, securities fraud) through the use of the spoken word, it is equally clear that the First Amendment does not protect an employer's or employee's right to engage in employment discrimination through the use of the spoken word. An employer that posted a "Whites Only" sign outside its workplace could not claim that the First Amendment right of free expression shielded its "speech" from the reach of a law prohibiting racial discrimination in employment (cf. *Pittsburgh Press Co.* v. *Human Rel. Comm'n* (1973) 413 U.S. 376 [93 S.Ct. 2553, 37 L.Ed.2d 669] ["male help wanted" and "female help wanted" designations constitute

██ ██ Defendants contend that, although it is proper to punish a defendant after the fact for a violation of the FEHA based upon spoken words, the trial court's injunction against the use of future epithets is an invalid prior restraint of speech. (*Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419 [91 S.Ct. 1575, 1577-1578, 29 L.Ed.2d 1]; *Near* v. *Minnesota, supra,* 283 U.S. 697, 713 [51 S.Ct. 625, 630].) Under well-established law, however, the injunction at issue is not an invalid prior restraint, because the order was issued only after the jury determined that defendants had engaged in employment discrimination, and the order simply precluded defendants from continuing their unlawful activity.

In *Kingsley Books, Inc.* v. *Brown* (1957) 354 U.S. 436, 437 [77 S.Ct. 1325, 1326, 1 L.Ed.2d 1469], the United States Supreme Court upheld a criminal provision authorizing a " 'limited injunctive remedy' " prohibiting "the sale and distribution of written and printed matter found after due trial to be obscene." The defendants did not contest that the printed material at issue was obscene, but argued that issuance of an injunction "amounts to a prior censorship" in violation of the First Amendment. (*Id.* at p. 440 [77 S.Ct. at p. 1327].) The high court rejected this argument, quoting *Near* v. *Minnesota, supra,* 283 U.S. 697, 716 [51 S.Ct. 625, 631], for the proposition that " 'the protection even as to previous restraint is not absolutely unlimited,' " and observing: "The phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." (354 U.S. at p. 441 [77 S.Ct. at p. 1328].) In upholding the statute, the court noted that the defendants "were enjoined from displaying for sale or distributing only the particular booklets thereto-fore published and adjudged to be obscene." (*Id.* at p. 444 [77 S.Ct. at p. 1329].) The high court then distinguished as "glaringly different" (*id.* at p. 445 [77 S.Ct. at p. 1330]) the decision in *Near* v. *Minnesota, supra,* 283 U.S. 697, in which the abatement as a public nuisance of a newspaper was found to be an invalid prior restraint, noting that the abatement in *Near* "enjoin[ed] the dissemination of future issues of a publication because its past issues had been found offensive," which is " 'the essence of censorship,' " while the injunction in *Kingsley Books* "studiously withholds restraint upon matters not already published and not yet found to be offensive." (354 U.S. at p. 445 [77 S.Ct. at p. 1330].)

In *Times Film Corp.* v. *Chicago* (1961) 365 U.S. 43, 44 [81 S.Ct. 391, 392, 5 L.Ed.2d 403], a film distributor challenged a municipal ordinance that

unprotected employment discrimination]), and an employer that utters or tolerates racial epithets or insults in the workplace that are so severe or pervasive as to alter the working conditions of targeted minority employees similarly may not take refuge in the claim that the racial harassment, because spoken, may not constitutionally be treated as employment discrimination.

required "submission of all motion pictures for examination prior to their public exhibition," claiming this was an invalid prior restraint on expression. The film distributor argued that the state must permit the motion picture to be shown and only thereafter could punish any violation of law that occurred. The high court disagreed and upheld the ordinance, stating that the distributor's argument "is founded upon the claim of absolute privilege against prior restraint under the First Amendment—a claim without sanction in our cases." (*Id.* at p. 49 [81 S.Ct. 394].)

The decision in *Freedman* v. *Maryland* (1965) 380 U.S. 51 [85 S.Ct. 734, 13 L.Ed.2d 649] reaffirmed the rule announced in *Times Film Corp.* v. *Chicago, supra,* 365 U.S. 43, that a requirement of submission of motion pictures in advance of exhibition does not necessarily constitute an invalid prior restraint, but clarified that such a requirement must include "procedural safeguards designed to obviate the dangers of a censorship system." (*Freedman* v. *Maryland, supra,* 380 U.S. at p. 58 [85 S.Ct. 739].) One such safeguard is that before an injunction may issue prohibiting the exhibition of a motion picture, there must be a judicial determination that the film does not constitute protected expression. The high court stated: "The teaching of our cases is that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint. [Citations.]" (*Ibid.*)

In *Paris Adult Theatre I* v. *Slaton* (1973) 413 U.S. 49, 55 [93 S.Ct. 2628, 2633-2634, 37 L.Ed.2d 446], the high court upheld a Georgia statute authorizing an injunction prohibiting the exhibition of obscene materials, stating: "Here, Georgia imposed no restraint on the exhibition of the films involved in this case until after a full adversary proceeding and a final judicial determination by the Georgia Supreme Court that the materials were constitutionally unprotected."

In *Pittsburgh Press Co.* v. *Human Rel. Comm'n, supra,* 413 U.S. 376, the United States Supreme Court upheld an order prohibiting a newspaper from publishing advertisements in a manner that would constitute employment discrimination. The city ordinance at issue in that case proscribed discrimination in employment in a manner similar to the FEHA and had been interpreted to forbid newspapers from carrying "help wanted" advertisements in gender-designated columns under captions such as "Male Help Wanted" and "Female Help Wanted." Observing that the ordinance made sexual discrimination in employment illegal, the high court held that the First Amendment did not protect such illegal conduct, stating: "We have no doubt that a newspaper constitutionally could be forbidden to publish a want

ad proposing a sale of narcotics or soliciting prostitutes." (413 U.S. at p. 388 [93 S.Ct. at p. 2560].) The high court concluded: "Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity."[7] (413 U.S. at p. 389 [93 S.Ct. at p. 2561].)

The court in *Pittsburgh Press Co.* then addressed the argument that the order forbidding the newspaper from publishing the advertisements in gender-designated columns was a prohibited prior restraint on expression. The high court, first noting that it never had held that all injunctions against newspapers were impermissible, stated: "The special vice of a prior restraint is that communication will be suppressed . . . before an adequate determination that it is unprotected by the First Amendment. [¶] The present order does not endanger arguably protected speech. Because the order is based on a continuing course of repetitive conduct, this is not a case in which the Court is asked to speculate as to the effect of publication. [Citations.] Moreover, the order is clear and sweeps no more broadly than necessary. And because no interim relief was granted, the order will not have gone into effect before our final determination that the actions of Pittsburgh Press were unprotected." (413 U.S. at p. 390 [93 S.Ct. at p. 2561], fn. omitted; see also *Madsen* v. *Women's Health Center, Inc.* (1994) 512 U.S. 753, 764, fn. 2 [114 S.Ct. 2516, 2524, 129 L.Ed.2d 593, 607] ["Not all injunctions that may incidentally affect expression, however, are 'prior restraints' in the sense that the term was used in *New York Times Co.*[v. *United States* (1971) 403 U.S. 713 [91 S.Ct. 2140, 29 L.Ed.2d 822]], or *Vance* [v. *Universal Amusement Co.* (1980) 445 U.S. 308 [100 S.Ct. 1156, 63 L.Ed.2d 413]]"].)

The foregoing high court decisions recognize that once a court has found that a specific pattern of speech is unlawful, an injunctive order prohibiting the repetition, perpetuation, or continuation of that practice is not a prohibited "prior restraint" of speech. (*Kramer* v. *Thompson* (3d Cir. 1991) 947 F.2d 666, 675 ["The United States Supreme Court has held repeatedly that an injunction against speech generally will not be considered an unconstitutional prior restraint if it is issued after a jury has determined that the speech is not constitutionally protected."].) For the same reason, the injunction at issue in the present case does not constitute a prohibited prior restraint on

---

[7] In *Central Hudson Gas & Elec.* v. *Public Serv. Comm'n* (1980) 447 U.S. 557, 566 [100 S.Ct. 2343, 2351, 65 L.Ed.2d 341], the high court stated: "For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading." (See also *Rubin* v. *Coors Brewing Co.* (1995) 514 U.S. 476 [115 S.Ct. 1585, 1589, 131 L.Ed.2d 532, 538-539].)

expression, provided the order "is clear and sweeps no more broadly than necessary." (*Pitsburgh Press Co.* v. *Human Rel. Comm'n, supra,* 413 U.S. 376, 390 [93 S.Ct. 2553, 2561].) The injunction at issue is based upon a continuing course of repetitive speech that has been judicially determined to violate the FEHA. Thus, prohibiting Avis and Lawrence from continuing to violate the FEHA does not violate their First Amendment rights.

A persuasive discussion is found in *Auburn Police Union* v. *Carpenter* (1st Cir. 1993) 8 F.3d 886, which upheld a Maine statute prohibiting persons from soliciting property for the benefit of a law enforcement officer, agency, or association. Violations of the statute could be enjoined and penalized civilly. The court of appeals rejected the argument that an injunction against such solicitation necessarily would constitute an invalid prior restraint on expression: "A prior restraint is a government regulation that limits or conditions in advance the exercise of protected First Amendment activity. [Citation.] Although the classic form of prior restraint involves an administrative licensing scheme, [citation], a judicial injunction that prohibits speech prior to a determination that the speech is unprotected also constitutes a prior restraint. [Citation.] Any system of prior restraints of speech 'comes to this Court bearing a heavy presumption against its constitutional validity.' [Citation.] [¶] . . . [¶] The Supreme Court, however, 'has never held that all injunctions are impermissible.' [Citation.] 'The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.' [Citation.] An injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior restraint." (*Id.* at p. 903; *Retail Credit Company* v. *Russell* (1975) 234 Ga. 765, 779 [218 S.E.2d 54, 62] [" 'The present order [an injunction prohibiting the defendant from continuing to report false credit information about the plaintiff] does not endanger arguably protected speech. Because the order is based on a continuing course of repetitive conduct, this is not a case in which the court is asked to speculate as to the effect of publication' "]; *Haseotes* v. *Cumberland Farms, Inc.* (Bankr. D.Mass. 1997) 216 B.R. 690, 695.)[8]

By parity of reasoning, the pervasive use of racial epithets that has been judicially determined to violate the FEHA is not protected by the First

---

[8]In a variety of contexts, courts have upheld injunctions prohibiting the continuation of a course of expressive conduct that violates a specific statutory prohibition. (*Vendo Co.* v. *Lektro-Vend Corp.* (1997) 433 U.S. 623, 635-636, fn. 6 [97 S.Ct. 2881, 2891, 53 L.Ed.2d 1009] ["nothing . . . prevents a federal court . . . [from] enjoin[ing] the commencement of additional state-court proceedings if it concludes from the course and outcome of the first one that such proceedings would constitute a violation of the antitrust laws"]; *San Antonio Hosp.* v. *So. Cal. Council of Carpenters* (9th Cir. 1997) 125 F.3d 1230 [upholding preliminary injunction against union to prohibit continuing display near hospital entrance of fraudulent

Amendment, and such unlawful conduct properly may be enjoined. (Cf. *E.E.O.C.* v. *Beverage Canners, Inc.* (11th Cir. 1990) 897 F.2d 1067, 1070 [upholding injunction directed to racially abusive language in workplace, without addressing free speech issues]; *Robinson* v. *Jacksonville Shipyards, Inc.* (M.D.Fla.1991) 760 F.Supp. 1486, 1535 [holding that First Amendment does not bar injunctive relief against continuing course of conduct found to constitute sexual harassment, including verbal harassment and display of sexually explicit photographs: "[T]he pictures and verbal harassment are not protected speech because they act as discriminatory conduct in the form of a hostile work environment."].) As the amicus curiae brief of the American Civil Liberties Union of Northern California suggests, the controlling authorities establish that "[s]peech may be enjoined where a fair judicial process has determined that a repetitive pattern of speech is unprotected."

## B.

Defendants also argue that the injunction violates the California Constitution. Article I, section 2, subdivision (a), of the California Constitution states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Avis and Lawrence rely heavily on a decision of this court, handed down more than a century ago, interpreting an earlier version of this provision.

In *Dailey* v. *Superior Court* (1896) 112 Cal. 94, 97 [44 P. 458], this court invalidated a superior court order prohibiting the performance or advertising of a play that was based upon the circumstances of a pending criminal case that was about to go to trial, unequivocally declaring: "We are entirely clear that the court had no jurisdiction to make the order which forms the basis of this proceeding, for such order was an attempted infringement upon rights guaranteed to every citizen by section 9, article I, of the constitution of this state. That section provides: 'Every citizen may freely speak, write and publish his [or her] sentiments on all subjects, being responsible for the

---

banner reading "THIS MEDICAL FACILITY IS FULL OF RATS"]; *Lothschuetz* v. *Carpenter* (6th Cir. 1990) 898 F.2d 1200, 1208 [directing entry of a "narrow and limited injunction to prohibit [the defendant] from continuing and reiterating the same libelous and defamatory charges"]; *O'Brien* v. *University Community Tenants Union, Inc.* (1975) 42 Ohio St.2d 242 [71 Ohio Op.2d 223, 327 N.E.2d 753] ["Once speech has judicially been found libelous, if all the requirements for injunctive relief are met, an injunction for restraint of continued publication of that *same* speech may be proper." (Italics in original.)]; *Advanced Training Sys.* v. *Caswell Equip. Co.* (Minn. 1984) 352 N.W.2d 1, 11 [42 A.L.R.4th 299] ["We therefore hold that the injunction below, limited as it is to material found either libelous or disparaging after a full jury trial, is not unconstitutional and may stand."]; *Federal Trade Comm'n* v. *Saja* (D.Ariz., Oct. 7, 1997, No. Civ-97-0666-PHX-SMM) 1997 WL 703399 [upholding injunction prohibiting continuation of fraudulent solicitations of charitable donations].)

abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.' The wording of this section is terse and vigorous, and its meaning so plain that construction is not needed. The right of the citizen to freely speak, write, and publish his sentiments is unlimited, but he is responsible at the hands of the law for an abuse of that right. He shall have no censor over him to whom he must apply for permission to speak, write, or publish, but he shall be held accountable to the law for what he speaks, what he writes, and what he publishes. It is patent that this right to speak, write, and publish, cannot be abused until it is exercised, and before it is exercised there can be no responsibility."

The above quoted language in *Dailey* cannot be interpreted as broadly as defendants suggest, to prohibit a court, under all circumstances, from enjoining "speech." The circumstances in *Dailey* involved a true prior restraint in which the superior court had prohibited the production of a play prior to its first performance simply because the play was based upon the circumstances of a pending criminal case. The court in *Dailey* was not faced with the question whether an injunction prohibiting the continuation of conduct that has been judicially determined to be unlawful constitutes a prior restraint. *Dailey*, therefore, does not support the position that the injunction in the present case constitutes an invalid prior restraint. (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] ["Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered."].)

Recent decisions of this court demonstrate that we have not adopted the rule advocated by defendants, that any injunction impinging upon the right of free expression constitutes an invalid prior restraint. In *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652 [119 Cal.Rptr. 468, 532 P.2d 116], while we observed that our state constitutional guarantee of free speech and press is "more definitive and inclusive than the First Amendment" (*id.* at p. 658), we recognized at the same time that "an injunction restraining speech may issue in some circumstances to protect private rights [citation] or to prevent deceptive commercial practices [citation]." (*Id.* at p. 662.) In *People* ex rel. *Busch* v. *Projection Room Theatre* (1976) 17 Cal.3d 42, 57 [130 Cal.Rptr. 328, 550 P.2d 600], we rejected the argument that enjoining the exhibition of obscene films or magazines would constitute an impermissible prior restraint, stating: "Thus, in the matters before us if the trial court finds the subject matter obscene under prevailing law an injunctive order may be fashioned that is 'proper and suitable' in each case. *It is entirely permissible from a constitutional standpoint to enjoin further exhibition of specific magazines or films which have been finally adjudged to be obscene following a full*

*adversary hearing. (Paris Adult Theatre I* v. *Slaton, supra,* 413 U.S. 49, 54-55 [37 L.Ed.2d 446, 454-456].)" (Italics added.)

In *Goldin* v. *Public Utilities Commission* (1979) 23 Cal.3d 638 [153 Cal.Rptr. 802, 592 P.2d 289], we affirmed an order of the Public Utilities Commission terminating a subscriber's telephone service on the ground that the service was being used to violate the law. At hearings before the commission, evidence was introduced establishing that the subscriber was operating a business offering outcall massage and nude modeling services. The commission found that the subscriber's telephone service had been used to facilitate the violation of Penal Code section 647, subdivision (b), which prohibits soliciting or engaging in an act of prostitution. The subscriber argued that terminating his telephone service violated his right to free speech. We rejected this argument, quoting the high court's decision in *Pittsburgh Press Co.* v. *Human Rel. Comm'n, supra,* 413 U.S. 376: "[T]elephone communication which does 'no more than propose a commercial transaction' can be . . . protected 'commercial speech.' By the same token, however, when such communication proposes, discusses, or is intended to encourage or facilitate a commercial transaction *which is itself illegal,* the principle established in the *Pittsburgh Press* case is applicable. Thus: 'Any First Amendment interest which might be served by [telephone communications concerning] an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation *is altogether absent* when the commercial activity itself is illegal and the restriction on [telephone communication] is incidental to a valid limitation on economic activity.' " (23 Cal.3d at p. 657, italics in *Goldin.*)

Most recently, in *People* ex rel. *Gallo* v. *Acuna* (1997) 14 Cal.4th 1090 [60 Cal.Rptr.2d 277, 929 P.2d 596], our court, in upholding against a First Amendment challenge the validity of an injunction restraining a wide array of future activities of gang members, explained that in a variety of respects a specific injunction, issued against a particular party on the basis of a proven past course of conduct, poses less of a danger to free speech interests than a general statutory prohibition. We noted: "As with any injunction, the preliminary decree here is addressed to identifiable parties and to specific circumstances; the enjoined acts are particularly described in the trial court's order. Unlike the pervasive 'chill' of an abstract statutory command that may broadly affect the conduct of an absent class and induce self-censorship, the decree here did not issue until after these defendants had had their day in court, a procedure that assures ' "a prompt and carefully circumscribed determination of the issue." ' [Citation.]" (14 Cal.4th at p. 1114, italics omitted.)

Under the California Constitution, as under its federal counterpart, the injunction in the present case thus does not constitute a prohibited prior

restraint of speech, because defendants simply were enjoined from continuing a course of repetitive speech that had been judicially determined to constitute unlawful harassment in violation of the FEHA.

## V

Defendants further claim that, even if some injunctive relief against future racial epithets is permissible, the order in this case is invalid because it is overly broad. As noted above, one provision of the injunction prohibited defendant Lawrence from "using any derogatory racial or ethnic epithets directed at, or descriptive of, Hispanic/Latino employees of Avis Rent A Car System, Inc. . . ." The Court of Appeal upheld this provision to the extent it prohibited Lawrence "from continuing to use racist epithets in the workplace," but ruled that, to the extent the prohibition applied to conduct outside the workplace, "it improperly exceeds the scope of the FEHA violation sought to be prevented and must be modified accordingly." In further response to defendants' claim, the Court of Appeal additionally restricted the injunction by directing the trial court to add to the injunction "an exemplary list of prohibited derogatory racial or ethnic epithets, specifying epithets, such as those actually used in the workplace by Lawrence" in order to "more precisely warn Lawrence and Avis what is forbidden." Because neither plaintiffs nor defendants have sought review of those limitations of the scope of the injunction, their validity is not before us and we express no opinion on that matter.

Defendants assert that, even as modified by the Court of Appeal, the injunction is overly broad because it enjoins Lawrence from employing racially derogatory terms "descriptive of" Avis's Hispanic employees, even outside the hearing of those employees.

Defendants argue that the use of racial epithets outside the hearing of Hispanic employees does not contribute to a hostile work environment if the audience does not find the speech unwelcome and the subjects of the racial invective are unaware they are being maligned. The Court of Appeal disagreed, stating: "Continual use of racist epithets poisons the atmosphere of the workplace, even when some of the invective is not directed at or even heard by the victims. If the Hispanic/Latino employees at Avis's San Francisco airport location know that Lawrence is free to continue voicing his on-the-job racist epithets behind their backs, it will remain a hostile place at which to work. Under the present circumstances, where there was direct racist invective, continued indirect invective would serve to maintain an abusive work environment, and thus both are properly enjoined."

The United States Supreme Court has held that an injunction that imposes a content-neutral restriction upon expression must "burden no more speech

than necessary to serve a significant government interest. [Citations.]" (*Madsen* v. *Women's Health Center, Inc., supra,* 512 U.S. 753, 765 [114 S.Ct. 2516, 2525, 129 L.Ed.2d 593, 608]; *People* ex rel. *Gallo* v. *Acuna, supra,* 14 Cal.4th 1090, 1120.) The high court explained: "Our close attention to the fit between the objectives of an injunction and the restrictions it imposes on speech is consistent with the general rule, quite apart from First Amendment considerations, 'that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.' [Citations.]" (*Madsen* v. *Women's Health Center, Inc., supra,* 512 U.S. at p. 765 [114 S.Ct. 2516, 2525, 129 L.Ed.2d 593, 608].)

Because defendants elected not to provide a transcript of the trial proceedings, we have no basis upon which to conclude that, in the particular circumstances of this case, it was unnecessary to prohibit the use of the racial epithets even outside the hearing of plaintiffs, in order to prevent a continuation of the hostile work environment. It certainly is possible that the use of racial epithets even outside the hearing of plaintiffs would contribute to an atmosphere of racial hostility that would perpetuate the hostile work environment created by defendants. Nothing in the limited record before us suggests that the injunction was more burdensome than necessary to prevent future violations of the FEHA.[9] The trial court found that John Lawrence's use of racial epithets was sufficiently severe or pervasive to constitute

[9]Justice Kennard's dissenting opinion suggests that the injunction is necessarily overbroad because it is not limited to the type of repeated or pervasive racial epithets that must *initially* be shown in order to establish the creation of an abusive or hostile work environment. The dissent cites no authority, however, to support the proposition that once it has been established that the existence of sufficiently severe or pervasive racial insults or epithets in a workplace already has created an abusive work environment, a court may not enjoin the offending party from perpetuating the abusive environment by continuing to use such racial insults or epithets in the future.

As a general matter, when a repeated course of conduct has been found to constitute a nuisance or unlawful employment practice, *a court is authorized to enjoin future individual acts that are likely to continue or perpetuate the nuisance or unlawful practice.* In *E.E.O.C.* v. *Wilson Metal Casket Co.* (6th Cir. 1994) 24 F.3d 836, the court upheld an injunction—following a finding of sexual harassment—that prohibited the defendant from leaving the premises with any female employee. Although this conduct, standing alone, did not constitute sexual harassment, it properly could be enjoined, because it was sufficiently "related to the proven unlawful conduct." (*Id.* at p. 842.) The court of appeals explained: "In the instant case, a distinct pattern of sexual harassment emerged. Wilson either waited until female employees were alone with him in isolated portions of the facilities or transferred them to isolated areas. Once they were isolated, he grabbed them and fondled their breasts and buttocks. With Barbara Ellis, in addition to unwanted fondling, Wilson forced her to engage in oral sex and sexual intercourse. Wilson also sexually propositioned female employees and asked them to accompany him off the company's premises. Based on this pattern of behavior, the injunction appropriately enjoins conduct which allowed sexual harassment to occur." (*Ibid.*; accord, *Kentucky Fried Chicken* v. *Diversified Packaging* (5th Cir. 1977) 549 F.2d 368, 390 ["An injunction can be therapeutic as well as protective. In fashioning relief against a party who

employment discrimination. The trial court further found that injunctive relief was necessary to prevent a continuation of the abusive work environment. Accordingly, the trial court enjoined Lawrence from "using any derogatory racial or ethnic epithets directed at, or descriptive of, Hispanic/Latino employees of Avis Rent A Car System, Inc." Because Lawrence's past use of such epithets in the workplace had been judicially determined to violate the FEHA, prohibiting him from continuing this discriminatory activity does not constitute an invalid prior restraint of speech.

### VI

The judgment of the Court of Appeal is affirmed.

Baxter, J., and Chin, J., concurred.

**WERDEGAR, J., Concurring.—** This case presents the collision of two very basic values protected by the United States Constitution. The first is to live one's life free of racial discrimination. (U.S. Const., Amend. XIV.) The second is to speak one's mind free of government censorship. (U.S. Const., Amend. I.) The trial court balanced these two bedrock constitutional principles to conclude defendant John Lawrence validly could be enjoined from engaging in a form of speech a jury found was in violation of the Fair Employment and Housing Act. (Gov. Code, § 12900 et seq. (hereafter FEHA).) A divided Court of Appeal affirmed the trial court judgment, but remanded the case to the trial court with directions to narrow the terms of the injunction by limiting it to the workplace and to provide an exemplary list of prohibited words.

To the extent the plurality opinion affirms the judgment of the Court of Appeal, and with my understanding of the purpose and context of the "exemplary list" of words (see *post*, at p. 169, fn. 9), I concur.[1] I write separately because the plurality opinion does not address what I believe to be a critical preliminary question, that is, whether the First Amendment permits imposition of civil liability under FEHA for pure speech that creates a racially hostile or abusive work environment. By declining to address this

---

has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable."].)

Thus, although a single use of a racial epithet, standing alone, would not create a hostile work environment, once the jury had determined that a pervasive pattern of such use had created a hostile work environment, the trial court in this case did not abuse its discretion in concluding that each additional instance would perpetuate the hostile environment and should be enjoined.

[1] I also agree with the plurality opinion's conclusion that the "secondary effects" doctrine does not control this case. (Plur. opn., *ante*, at p. 135, fn. 4.)

question, the plurality opinion fails to acknowledge that we are with this case sailing into uncharted First Amendment waters. No decision by the United States Supreme Court has, as yet, declared that the First Amendment permits restrictions on speech creating a hostile work environment; indeed, the question is one of considerable debate among First Amendment scholars.[2] (Volokh, *How Harassment Law Restricts Free Speech* (1995) 47 Rutgers L.Rev. 563; Sangree, *Title VII Prohibitions Against Hostile Environment Sexual Harassment and the First Amendment: No Collision in Sight* (1995) 47 Rutgers L.Rev. 461 (Sangree, *No Collision in Sight*); Fallon, *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark* (1994) 1994 Sup. Ct. Rev. 1 (Fallon, *Sexual Harassment*); Gerard, *The First Amendment in a Hostile Environment: A Primer on Free Speech and Sexual Harassment* (1993) 68 Notre Dame L.Rev. 1003; Comment, *Freedom of Speech and Workplace Harassment* (1992) 39 UCLA L.Rev. 1791 (Volokh, *Workplace Harassment*); Browne, *Title VII as Censorship: Hostile-Environment Harassment and the First Amendment* (1991) 52 Ohio St. L.J. 481 (Browne, *Title VII as Censorship*); Strauss, *Sexist Speech in the Workplace* (1990) 25 Harv. C.R.-C.L. L.Rev. 1.) Accordingly, a serious question arises whether or not the injunction in this case constitutes an impermissible prior restraint on defendant John Lawrence's speech.

As I explain, despite the absence of any direct United States Supreme Court authority finding speech creating a hostile work environment falls outside the protection of the First Amendment, existing high court decisions provide strands of analysis that, woven together, produce a coherent theory that explains why the injunction in this case does not violate defendant Lawrence's First Amendment rights.

I

At the outset, I note the appellate record in this case is woefully inadequate. Defendants proceeded in this appeal by relying on an appellants' appendix in lieu of a clerk's transcript. This is a permissible choice under the

---

[2]"There is a lively debate within First Amendment scholarship over the constitutional *status* of discriminatory verbal harassment, particularly in the workplace. A number of decisions finding harassment liability under Title VII have turned in whole or in part on what we would ordinarily recognize as 'speech'; yet few courts have seriously considered the relevance of the First Amendment in this regard. The commentators have stepped into the judicial vacuum with gusto. Some commentators have argued that Title VII's harassment law, as applied to nearly all speech, abridges the freedom of speech protected by the First Amendment. Others have defended harassment law as both necessary to workplace equality and entirely consistent with free speech principles and doctrine. Still others situate themselves at some point in the middle and advocate some restrictions on the application of Title VII to speech." (Estlund, *The Architecture of the First Amendment and the Case of Workplace Harassment* (1997) 72 Notre Dame L.Rev. 1361, 1363-1364, fns. omitted.)

rules governing appellate procedure (see Cal. Rules of Court, rule 5.1), but, as a consequence of that choice, the record does not reveal what defendant Lawrence said that the jury found created a hostile work environment in violation of FEHA. The record also does not reveal how often he made the offending utterances or in what context. Defendants, of course, as the appellants in this case, bear the burden of providing a record on appeal that is adequate to adjudicate their claims. (*Null* v. *City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1532, 1535 [254 Cal.Rptr. 492]; *Buckhart* v. *San Francisco Residential Rent etc., Bd.* (1988) 197 Cal.App.3d 1032, 1036 [243 Cal.Rptr. 298]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 518, pp. 562-564.) If the record furnished is insufficient to establish the merits of an appellant's legal position, it is the appellant who bears the risk of uncertainty caused by the lacuna. (See, e.g., plur. opn., *ante*, at p. 132 [rejecting claims for failure to provide an adequate record]; *Null* v. *City of Los Angeles*, *supra*, at p. 1536.)

Even if defendants took this risk willingly, for an appellate court to adjudicate an important First Amendment case on such a sketchy record is unfortunate. Were we apprised of the nature and frequency of Lawrence's verbal outbursts against plaintiffs, perhaps we would find his speech did not actually create a hostile work environment, thereby rendering resolution of this important constitutional issue unnecessary. (See *People* v. *Hernandez* (1998) 19 Cal.4th 835, 845-848 [80 Cal.Rptr.2d 754, 968 P.2d 465] (dis. opn. of Werdegar, J.) [court should not decide constitutional issues until necessary to do so]; *People* v. *Bennett* (1998) 17 Cal.4th 373, 393 [70 Cal.Rptr.2d 850, 949 P.2d 947] (conc. opn. of Werdegar, J.) [same].) Were we provided with a record describing the nature of Lawrence's epithets, perhaps we would find, for example, that his speech fell into the category of so-called "fighting words," which the high court has found unprotected by the First Amendment. (See *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568 [62 S.Ct. 766, 86 L.Ed. 1031].) Or perhaps, if his offensive speech was combined with conduct, different First Amendment concerns would be implicated. (See *Texas* v. *Johnson* (1989) 491 U.S. 397 [109 S.Ct. 2533, 105 L.Ed.2d 342]; *United States* v. *O'Brien* (1968) 391 U.S. 367 [88 S.Ct. 1673, 20 L.Ed.2d 672].)

Lacking a record that would resolve these questions, we must decide the case as we find it. I proceed now to explain briefly why I find the plurality opinion's analysis unsatisfactory; I next put forth a different analysis supportive of the judgment.

## II

From the abbreviated record provided by defendants, we may discern that the jury found defendant Lawrence created a hostile work environment by

engaging in a continuous pattern and practice of using racial and other epithets to demean and embarrass a group of Latino workers. The plurality opinion concludes we need not in this case confront the thorny constitutional question of whether speech alone may constitute the basis for liability based on the creation of a hostile work environment, reasoning that "defendants have not challenged the finding that their past conduct amounted to unlawful employment discrimination in violation of the FEHA, [so] we need not, and do not, address that broad issue here." (Plur. opn., *ante*, at p. 131, fn. 3.)

By taking this approach, the plurality opinion never establishes the speech at issue in this case is unprotected by the First Amendment. Although the opinion declares that under "well-established law" the injunction is not an invalid prior restraint, "because the order was issued only after the jury determined that defendants had engaged in employment discrimination, and the order simply precluded defendants from continuing their unlawful activity" (plur. opn., *ante*, at p. 138), as discussed at greater length hereafter (*post*, at pp. 152-155), I can locate no authority from this court or the United States Supreme Court that concludes speech in the workplace that creates a racially hostile work environment, *standing alone*, can be made the basis of civil liability (under either FEHA or the similar federal law, title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (hereafter title VII)[3]) consistent with the First Amendment's guarantee that the state shall not make laws "abridging the freedom of speech." (See *Gitlow* v. *New York* (1925) 268 U.S. 652, 666 [45 S.Ct. 625, 629-630, 69 L.Ed. 1138] [applying the First Amendment to the states].)

The plurality opinion's implicit assumption that a legislative body can validly pass a statute having the effect of removing constitutional protection from speech is unfounded. For example, the mere fact Congress has decreed (by enacting title VII) that the creation of an abusive or hostile work environment violates federal law does not *necessarily mean* racial speech creating such a work atmosphere is unprotected by the First Amendment. Congress cannot, by legislation, change the scope of one's First Amendment rights. (*United States* v. *Eichman* (1990) 496 U.S. 310 [110 S.Ct. 2404, 110

---

[3] Harassment in the workplace is also prohibited by federal law. (42 U.S.C. § 2000e et seq.) "Although the wording of title VII differs in some particulars from the wording of FEHA, the antidiscriminatory objectives and overriding public policy purposes of the two acts are identical." (*Beyda* v. *City of Los Angeles* (1998) 65 Cal.App.4th 511, 517 [76 Cal.Rptr.2d 547].) "Where there is a dearth of state authority in an area of emerging law, such as employment discrimination, it is appropriate to consider federal cases interpreting title VII." (*Mogilefsky* v. *Superior Court* (1993) 20 Cal.App.4th 1409, 1416, fn. 5 [26 Cal.Rptr.2d 116].) "Although they are not controlling, federal cases interpreting title VII are instructive when analyzing a FEHA claim." (*Spaziano* v. *Lucky Stores, Inc.* (1999) 69 Cal.App.4th 106, 112 [81 Cal.Rptr.2d 378].)

L.Ed.2d 287] [Flag Protection Act of 1989 violated the First Amendment]; cf. *City of Boerne* v. *Flores* (1997) 521 U.S. 507 [117 S.Ct. 2157, 138 L.Ed.2d 624] [Congress's attempt to redefine scope of free exercise clause by enacting the Religious Freedom Restoration Act of 1993 found unconstitutional].) Likewise, the mere fact the jury found defendant Lawrence was in violation of FEHA does not necessarily mean his speech was unprotected by the First Amendment.

In sum, by relying on the jury's finding that defendants were liable for violating FEHA, together with defendants' failure to challenge that finding on appeal, the plurality opinion attempts to resolve this case without deciding the critical First Amendment question involved. In contrast, I believe we must confront the fundamental preliminary question whether speech creating a racially hostile work environment is protected by the First Amendment. I now turn to that question.

### III

I begin my analysis with the recognition that we must assume for purposes of this appeal that defendant Lawrence engaged in a pervasive practice of hurling racially tinged insults at Latino workers, singling them out as the recipients of his offensive epithets. Defendant Avis Rent A Car System, Inc., Lawrence's employer, tolerated this outrageous workplace behavior and was thus complicit in the creation of a racially hostile and abusive work environment. Though I assume the majority of persons finds such words distasteful, their utterance nevertheless is generally protected by the free speech guarantee of the First Amendment to the United States Constitution. If Lawrence's invective would not have caused a reasonable person to react with violence (*Chaplinsky* v. *New Hampshire, supra,* 315 U.S. 568), if his words did not incite people to engage in imminent lawless action under circumstances making such action reasonably likely (*Brandenburg* v. *Ohio* (1969) 395 U.S. 444 [89 S.Ct. 1827, 23 L.Ed.2d 430] (*per curiam*)), if his words were not obscene under the *Miller* test (*Miller* v. *California* (1973) 413 U.S. 15 [93 S.Ct. 2607, 37 L.Ed.2d 419]), if his words did not come within some other category of speech the high court has found outside the First Amendment's protective umbrella, then an injunction prohibiting Lawrence from expressing himself in his chosen manner simply because we (or the Legislature) disagree with his message or wish to protect listeners against hurt feelings raises serious constitutional concerns.[4]

It is true Lawrence chose to express himself in a rude and provocative manner, inevitably producing feelings of anger, hostility and humiliation in

---

[4]The law generally prohibiting prior restraints on speech is settled. "Any system of prior restraint . . . 'comes to this Court bearing a heavy presumption against its constitutional validity.' *Bantam Books, Inc.* v. *Sullivan,* [(1963)] 372 U. S. [58,] 70 [83 S.Ct. 631, 639, 9

his listeners, the plaintiffs here. However, "[i]nsults may contain a point of view that the speaker is entitled to express and his audience to hear. 'Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases.' " (Fried, *The New First Amendment Jurisprudence: A Threat to Liberty* (1992) 59 U. Chi. L.Rev. 225, 242, quoting *NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 928 [102 S.Ct. 3409, 3434, 73 L.Ed.2d 1215]; see also Greenawalt, *Insults and Epithets: Are They Protected Speech?* (1990) 42 Rutgers L.Rev. 287, 302 ["It is no coincidence that the less privileged and more radical are those who often use words and phrases that might be judged to impair civil discourse."].) As the Supreme Court has trenchantly observed, "[s]urely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us." (*Cohen* v. *California* (1971) 403 U.S. 15, 25 [91 S.Ct. 1780, 1788, 29 L.Ed.2d 284].)

What, then, of the rights of the Latino workers, who were the unwilling targets of Lawrence's racial invective? Do they have the right *not* to listen, a right to work free of racial discrimination and intimidation? Do Lawrence's First Amendment rights trump their rights? Most fundamentally, do Lawrence's racially offensive epithets come within the protection of the First Amendment?

## A. The Relevance of R.A.V. and Harris

As noted, *ante*, nothing in the decisions of the Supreme Court provides definitive guidance on whether racist speech at the workplace that is so pervasive and constant that it creates a hostile and abusive work environment is protected by the First Amendment's guarantee of freedom of speech. Hints from two decisions, however, suggest the high court considers such speech outside the protective scope of the First Amendment.

In 1992, the Supreme Court held the City of St. Paul's municipal ordinance banning certain hate speech was unconstitutional. (*R. A. V.* v. *St. Paul*

L.Ed.2d 584] [citations]. The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." (*Southeastern Promotions, Ltd.* v. *Conrad* (1975) 420 U.S. 546, 558-559 [95 S.Ct. 1239, 1246, 43 L.Ed.2d 448], italics in original.) The government bears a " 'heavy burden' " to justify a prior restraint. (*New York Times Co.* v. *United States* (1971) 403 U.S. 713, 714 [91 S.Ct. 2140, 2141, 29 L.Ed.2d 822] *(per curiam)*; *Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419 [91 S.Ct. 1575, 1577-1578, 29 L.Ed.2d 1].)

(1992) 505 U.S. 377 [112 S.Ct. 2538, 120 L.Ed.2d 305] (*R.A.V.*).) Justice Scalia, speaking for a five-justice majority, explained that, although fighting words in general are not protected by the First Amendment, the city's ordinance unconstitutionally engaged in viewpoint discrimination by prohibiting hate speech on some topics but not others. Noting the ordinance outlawed fighting words "that insult, or provoke violence, 'on the basis of race, color, creed, religion, or gender'" (*id.* at p. 391 [112 S.Ct. at p. 2547]), the majority found it significant that "[d]isplays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use 'fighting words' in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered." (*Ibid.*)

The justices concurring separately in the *R.A.V.* decision expressed concern that the majority's rationale called into question the constitutionality of sexual harassment claims under title VII, which declares it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." (42 U.S.C. § 2000e-2(a)(1).) Thus, Justice White, writing for four justices, stated that "[u]nder the broad principle the Court uses to decide the present case, hostile work environment claims based on sexual harassment should fail First Amendment review . . . ." (*R.A.V., supra,* 505 U.S. at pp. 409-410 [112 S.Ct. at p. 2557] (conc. opn. of White, J.).)

Addressing this question, Justice Scalia replied that title VII claims did not come within the ambit of the majority's analysis: "since words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets), a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech. [Citations.] Thus, for example, sexually derogatory 'fighting words,' *among other words,* may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices, [citations]." (*R.A.V., supra,* 505 U.S. at p. 389 [112 S.Ct. at p. 2546], italics added.)

Of course, *R.A.V.* did not involve a title VII claim and thus its pronouncement on whether such a claim would survive under the First Amendment is dictum. Moreover, what Justice Scalia was referring to when he explained that, in addition to fighting words, some "other words" could produce a constitutionally valid hostile work environment claim under title VII is

unclear. We need not unravel this conundrum, however. It is enough for us to recognize that "[w]hen the majority and concurring opinions are viewed in conjunction, it appears that all nine Justices participating in *R.A.V.* assumed that the core Title VII prohibition against speech that creates a discriminatorily hostile work environment would pass constitutional muster." (Fallon, *Sexual Harassment, supra*, 1994 Sup. Ct. Rev. at p. 12.) Thus, although *R.A.V.* did not "hold" that harassing workplace speech violative of title VII is unprotected speech, the opinions in the case suggest the court would so hold.

The next year, the Supreme Court gave a further hint of its views when it decided *Harris* v. *Forklift Systems, Inc.* (1993) 510 U.S. 17 [114 S.Ct. 367, 126 L.Ed.2d 295] (*Harris*). *Harris* concerned a sexual harassment claim under title VII, the basis of which involved both conduct and speech. For example, the defendant's male president made Harris, the plaintiff, the target of sexual innuendo and made comments such as " 'You're a woman, what do you know' " and that Harris was " 'a dumb ass woman.' " (*Harris, supra*, at p. 19 [114 S.Ct. at p. 369].) He also made sexually suggestive comments about Harris's clothing. (*Ibid.*) Because the case involved the defendant's speech as a contributory factor to the creation of a hostile work environment, "[s]ome observers therefore thought that the Supreme Court might use *Harris* to clarify the bearing of the First Amendment on sexual harassment law and, in doing so, might cut back sharply on accepted theories of Title VII liability." (Fallon, *Sexual Harassment, supra*, 1994 Sup. Ct. Rev. at pp. 1-2.) That both the parties and amici curiae briefed the First Amendment issue before the court further supported this belief. (*Id.* at pp. 9-10 & fns. 44-47.)

It was not to be. The Supreme Court in *Harris* simply found that, where an abusive and hostile work environment is created in violation of title VII, the plaintiff's entitlement to relief is not dependent on her ability to show she suffered psychological injury. (*Harris, supra*, 510 U.S. at p. 22 [114 S.Ct. at p. 371].) Neither Justice O'Connor, who wrote for the *Harris* majority, nor Justices Scalia or Ginsburg, concurring separately, mentions whether harassing speech, standing alone, may constitute a violation of title VII consistent with the First Amendment.[5]

The question thus remains open.[6] Nevertheless, I find strands of analysis in several high court decisions which, taken together, indicate that, even if

---

[5]The *Harris* majority at one point noted that whether a hostile or abusive work environment exists under title VII requires consideration of several factors, including whether the harassing conduct is severe "or a mere offensive utterance." (*Harris, supra*, 510 U.S. at p. 23 [114 S.Ct. at p. 371].)

[6]Professor Fallon argues that after *R.A.V., supra*, 505 U.S. 377, and *Harris, supra*, 510 U.S. 17, "it is virtually inconceivable that the Supreme Court might hold that the First Amendment

speech creating a racially hostile or abusive work environment is protected by the First Amendment, such speech may be subject to some restrictions consistent with that amendment. I turn now to discussion of these strands.

## B. *Speech in the Workplace*

Of course, speech is not wholly protected from government regulation in all places; the location of the speech is relevant to the degree of protection, if any, the speech will receive under the First Amendment. (*Frisby* v. *Schultz* (1988) 487 U.S. 474, 479 [108 S.Ct. 2495, 2500, 101 L.Ed.2d 420] (*Frisby*) ["To ascertain what limits, if any, may be placed on protected speech, we have often focused on the 'place' of that speech, considering the nature of the forum the speaker seeks to employ."]; *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298, 302-303 [94 S.Ct. 2714, 2717, 41 L.Ed.2d 770] (plur. opn.) ["[T]he nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the [First] Amendment to the speech in question."].)

For example, speech uttered in a traditional public forum is afforded the highest degree of protection from state regulation. (*Perry Ed. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37, 45 [103 S.Ct. 948, 955, 74 L.Ed.2d 794] (*Perry*).) Streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." (*Hague* v. *C. I. O.* (1939) 307 U.S. 496, 515 [59 S.Ct. 954, 964, 83 L.Ed. 1423].) Content-based restrictions on speech uttered in a traditional public forum must be narrowly tailored to achieve a compelling state interest. (*Perry, supra,* at p. 45 [103 S.Ct. at p. 955].)

Speech may occur in nonpublic fora as well, but in such cases the government is permitted to place reasonable restrictions on speech, even based on its content. (See *Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119 [97 S.Ct. 2532, 53 L.Ed.2d 629] [prison]; *Greer* v. *Spock* (1976) 424 U.S. 828 [96 S.Ct. 1211, 47 L.Ed.2d 505] [military base]; *Adderley* v. *Florida* (1966) 385 U.S. 39 [87 S.Ct. 242, 17 L.Ed.2d 149] [jail].) Thus, speech in nonpublic fora is subject to reasonable time, place and manner restrictions, and "the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (*Perry, supra,* 460 U.S. at p. 46 [103 S.Ct. at p. 955].)

forbids the imposition of Title VII liability for a broad category of sexually harassing speech." (Fallon, *Sexual Harassment, supra,* 1994 Sup. Ct. Rev. at p. 9.)

Not all speech-related activity occurs publicly in traditional public or even nonpublic fora. For most adult Americans, a great deal of time is spent at work. That the speech at issue in this case occurred at plaintiffs' workplace is significant, because the Supreme Court has recognized that speech occurring in the workplace presents special considerations that sometimes permit greater restrictions on First Amendment rights. For example, in *Connick* v. *Myers* (1983) 461 U.S. 138 [103 S.Ct. 1684, 75 L.Ed.2d 708] (*Connick*), an assistant district attorney unhappy with a job transfer circulated a questionnaire in her office, asking her colleagues their opinion about "[the] office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." (*Id.* at p. 141 [103 S.Ct. at p. 1687], fn. omitted.) The district attorney fired her in part for this speech-related action, but the district court ordered her reinstated. The circuit court of appeals affirmed. The Supreme Court granted certiorari and reversed. The court explained that, with the exception of the question about political campaigns, the plaintiff's speech was not a matter of "public concern" and that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." (*Id.* at p. 146 [103 S.Ct. at p. 1690].) Thus, the Supreme Court held the employee's free speech rights could constitutionally be curtailed on the job. (See also *Branti* v. *Finkel* (1980) 445 U.S. 507 [100 S.Ct. 1287, 63 L.Ed.2d 574] [recognizing that for some public jobs, an employer could fire an employee for belonging to a particular political party without violating the employee's First Amendment rights, but holding assistant public defender is not such a job]; but see *Rankin* v. *McPherson* (1987) 483 U.S. 378 [107 S.Ct. 2891, 97 L.Ed.2d 315] (*Rankin*) [violation of clerical employee's First Amendment rights for constable to fire her for expressing opinion, while on the job, that she disagreed with the president's policies and hoped he would be killed]; Rosenthal, *Permissible Content Discrimination Under the First Amendment: The Strange Case of the Public Employee* (1998) 25 Hastings Const. L.Q. 529, 550-551 [criticizing *Connick* and arguing that *Connick* and *Rankin* "point in different directions"].)

The intersection of an individual's place of employment and his or her free speech rights also appeared in *CSC* v. *Letter Carriers* (1973) 413 U.S. 548 [93 S.Ct. 2880, 37 L.Ed.2d 796] (*Letter Carriers*). In that case, the high court held the Hatch Act (5 U.S.C. former § 7324(a)(2), now see § 7323), which as then written prohibited federal employees from taking active roles in political campaigns for public office, did not violate federal employees' rights under the First Amendment. Although activity in political campaigns

is core political speech that would otherwise be entitled to the highest constitutional protection, the court found substantial public policy reasons justified the limitation on employee speech. "[A] judgment [was] made by this country over the last century that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees on others and on the electoral process should be limited." (*Letter Carriers, supra,* at p. 557 [93 S.Ct. at p. 2886]; but see *Bauers* v. *Cornett* (8th Cir. 1989) 865 F.2d 1517, 1523 [explaining that Hatch Act was amended after *Letter Carriers*].) Thus, a strong public policy in avoiding coercing public employees to work on political campaigns justified restrictions on employees' First Amendment rights. (Cf. *Snepp* v. *United States* (1980) 444 U.S. 507 [100 S.Ct. 763, 62 L.Ed.2d 704] (*per curiam*) [imposition of constructive trust on book profits justified by failure of former Central Intelligence Agency employee, in violation of employment agreement, to obtain clearance from agency before publishing book based on admittedly unclassified information].)

Thus, in order to vindicate sufficiently weighty public policies governing the workplace, the high court has in the past found the First Amendment rights of employees must sometimes give way. In the cases described above, however, the government directly restricted the speech of public employees. Not so with *NLRB* v. *Gissel Packing Co.* (1969) 395 U.S. 575 [89 S.Ct. 1918, 23 L.Ed.2d 547] (*Gissel*). In that case, a private employer, Sinclair Company, faced a union organizing campaign among its workers. When the president of Sinclair Company first learned of the campaign, he spoke to his employees, attempting to dissuade them from joining a union. He stated that the workers were forgetting the " 'lessons of the past' " when a prior strike had shut down the plant for three months and the plant had then reopened without a union contract; that the company was still on " 'thin ice' " financially; that a strike " 'could lead to the closing of the plant' "; and that because of their age and the limited usefulness of their skills, the workers would not find ready employment if the plant closed. (*Id.* at pp. 587-588 [89 S.Ct. at p. 1926].) In the weeks leading up to the election, the company sent each of the workers letters and pamphlets to the same effect. (*Id.* at pp. 588-589 [89 S.Ct. at p. 1927].) When the union lost the election, it filed objections to the employer's communications.

As pertinent here, the National Labor Relations Board (NLRB) found Sinclair Company's communications with its workers violated section 8(a)(1) of the National Labor Relations Act, codified at 29 United States Code section 158(a): "It shall be an unfair labor practice for an employer— [¶] (1) to interfere with, restrain, or coerce employees in the exercise of the

rights guaranteed in section 157 of this title." Title 29, United States Code section 158(c) provides: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." The United States Court of Appeals for the First Circuit affirmed the NLRB's ruling.

On certiorari before the Supreme Court, Sinclair Company argued that application of these rules to the speech of its president violated his First Amendment rights. The high court rejected the argument, reasoning that "[a]ny assessment of the precise scope of employer expression, of course, must be made *in the context of its labor relations setting.*" (*Gissel, supra,* 395 U.S. at p. 617 [89 S.Ct. at p. 1942], italics added.) The Supreme Court emphasized that the employer's First Amendment rights must be balanced against "the equal rights of the employees to associate freely," and the court must "take into account the economic dependence of the employees on their employers." (*Ibid.*) In such a setting, said the court, free speech rights in the workplace must be distinguished from speech relating to "the election of legislators or the enactment of legislation . . . where the independent voter may be freer to listen more objectively and employers as a class freer to talk." (*Id.* at pp. 617-618 [89 S.Ct. at p. 1942].) In short, because the speech at issue occurred at the workplace, some restrictions on speech could be tolerated that would be impermissible if applied to speech in other settings.

Of course, employees retain First Amendment rights while on the job (*Rankin, supra,* 483 U.S. 378; *Branti* v. *Finkel, supra,* 445 U.S. 507); *Gissel* did not create a general "workplace exception" to the First Amendment. Still, "in *Gissel* the Supreme Court validated congressional power, under the Commerce Clause, to impose content-based speech restrictions in the workplace to effectuate values embodied in the greater Constitution. The *Gissel* Court's holding, in large part, rested on its understanding of the unique nature of the employment relationship and the potential for even subtle coercion in this context to undermine valid economic policy which promotes constitutional interests." (Sangree, *No Collision in Sight, supra,* 47 Rutgers L.Rev. at p. 520; see also Fallon, *Sexual Harassment, supra,* 1994 Sup. Ct. Rev. at p. 19 [advocating development of a workplace speech doctrine "responding to distinctive features of the workplace"]; but see Volokh, *Workplace Harassment, supra,* 39 UCLA L.Rev. at pp. 1820-1822 [reading *Gissel* much more narrowly].)

Thus, *Connick, Letter Carriers* and *Gissel* demonstrate the Supreme Court's recognition that strong public policies governing the workplace—

both private and public—may justify some limitations on the free speech rights of employers and employees. This view is consistent with the reality that workplaces and jobsites are not usually thought of as marketplaces for the testing of political and social ideas (Balkin, *Some Realism About Pluralism: Legal Realist Approaches to the First Amendment* (1990) 1990 Duke L.J. 375, 423 [suggesting some may view workplace speech as different from political speech generally]), and, therefore, the importance of preserving the workplace as a forum where free speech rights will outweigh other important constitutional considerations is diminished.

## C. *Employees Are a Captive Audience*

In addition to high court authority recognizing free speech limitations at the workplace, another analytical strand that recurs frequently in Supreme Court decisions is relevant here. The Supreme Court has in a number of cases recognized that when an audience has no reasonable way to escape hearing an unwelcome message, greater restrictions on a speaker's freedom of expression may be tolerated. Stated differently, even if the speaker enjoys the right to free speech, he or she has no corollary right to force people to listen.

The relevance of a captive audience to determining the scope of First Amendment protection of speech is exemplified by *Frisby, supra,* 487 U.S. 474. In that case, the Supreme Court upheld an ordinance that prohibited focused picketing in front of an individual's home. Although picketing is generally characterized as core political speech (*Carey* v. *Brown* (1980) 447 U.S. 455, 460 [100 S.Ct. 2286, 65 L.Ed.2d 263]; *Shuttlesworth* v. *Birmingham* (1969) 394 U.S. 147, 152 [89 S.Ct. 935, 939, 22 L.Ed.2d 162]) and was so in *Frisby* (the resident was targeted because he was a physician who performed abortions), the Supreme Court explained that "[t]he First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." (*Frisby, supra,* at p. 487 [108 S.Ct. at p. 2504].)

The high court responded to similar concerns in *Bethel School Dist. No. 403* v. *Fraser* (1986) 478 U.S. 675 [106 S.Ct. 3159, 92 L.Ed.2d 549] (*Bethel School*). In *Bethel School,* the high court upheld discipline imposed on a high school student who gave a speech laced with sexual innuendo at a school assembly that many students were required to attend. Although relying largely on the presence of children at the assembly, the high court also stated that school authorities acting in loco parentis "[should] protect children—*especially in a captive audience*—from exposure to sexually explicit, indecent, or lewd speech." (*Id.* at p. 684 [106 S.Ct. at p. 3165], italics added.)

That the presence of a captive audience is important in determining the proper degree of First Amendment protection was also discussed in *Rowan v. Post Office Dept.* (1970) 397 U.S. 728 [90 S.Ct. 1484, 25 L.Ed.2d 736] (*Rowan*). In *Rowan*, the appellants challenged the constitutionality of a federal law that permitted householders to request their name be removed from mailing lists so they might not receive sexually themed mailings. The Supreme Court upheld the law, stating: "We . . . categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another. If this prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even 'good' ideas on an unwilling recipient. That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech . . . does not mean we must be captives everywhere." (*Id.* at p. 738 [90 S.Ct. at p. 1491].)

In addition to *Frisby, Bethel School* and *Rowan,* numerous other cases have cited an audience's "captivity" as a factor justifying limitations on free speech. (*FCC* v. *Pacifica Foundation* (1978) 438 U.S. 726, 748-750 [98 S.Ct. 3026, 3040-3041, 57 L.Ed.2d 1073] (plur. opn.) (*Pacifica*) [possibility that nonconsenting adults might inadvertently tune in to radio broadcast containing indecent speech justified precluding broadcast during the day]; *id.* at p. 759 [98 S.Ct. at pp. 3045-3046] (conc. opn. of Powell, J.) ["Although the First Amendment may require unwilling adults to absorb the first blow of offensive but protected speech when they are in public before they turn away . . . , a different order of values obtains in the home."]; *Erznoznik* v. *City of Jacksonville* (1975) 422 U.S. 205, 209 [95 S.Ct. 2268, 2272, 45 L.Ed.2d 125] (*Erznoznik*) [restrictions on speech are justified when "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure"]; *id.* at p. 218 [95 S.Ct. at p. 2277] (conc. opn. of Douglas, J.) [endorsing view that "a narrowly drawn ordinance could be utilized within constitutional boundaries to protect the interests of captive audiences"]; *Lehman* v. *City of Shaker Heights, supra,* 418 U.S. at p. 302 [94 S.Ct. at pp. 2716-2717] (plur. opn.) [recognizing riders of public transit are a captive audience to advertising placed inside the cars]; *id.* at pp. 306-307 [94 S.Ct. at p. 2719] (conc. opn. of Douglas, J.) [also recognizing bus riders are a captive audience]; *Cohen* v. *California, supra,* 403 U.S. at pp. 21-22 [91 S.Ct. at pp. 1786] [noting those objecting to the defendant's objectionable message, exhibited on his jacket, could simply avert their eyes].)

The relative captivity of plaintiffs here supports the restriction on defendant Lawrence's speech. Plaintiffs were not present at their job because they wished to hear Lawrence's particular views on their Latino heritage, but neither were they reasonably free to walk away when confronted with his

racial slurs. Although plaintiffs could have avoided the undesired speech by quitting their jobs and seeking employment with more racially tolerant supervisors, the cases discussed above indicate the captive audience doctrine is not reserved for situations in which listeners are physically unable to leave, such as passengers on airplanes or inmates in prison. The Constitution does not require plaintiffs to sacrifice their employment to avoid a racially clamorous work environment any more than the doctor in *Frisby, supra,* 487 U.S. 474 was required to move from his home, the students in *Bethel School, supra,* 478 U.S. 675 were required to leave school, or the passengers in *Lehman* v. *City of Shaker Heights, supra,* 418 U.S. 298 were required to walk home. People need not engage in heroic efforts before we will conclude they have sufficiently averted their eyes and plugged their ears. People need to work; expecting them to walk past someone handing out leaflets on the sidewalk without accepting and reading the flyer is not the same as requiring them to walk off their job to avoid unwanted speech. So long as avoiding unwelcome speech is—as here—sufficiently "impractical" (*Erznoznik, supra,* 422 U.S. at p. 209 [95 S.Ct. at p. 2272]), we can conclude listeners constitute a captive audience, with the result that courts will show greater solicitude for their privacy and their right not to be forced to listen to unwelcome speech.

Most of the cases cited above concededly did not solely concern a captive audience. *Frisby, Pacifica* and *Rowan* relied in addition on the increased privacy interest in one's home. (*Frisby, supra,* 487 U.S. at pp. 484-485 [108 S.Ct. at p. 2502]; *Pacifica, supra,* 438 U.S. at pp. 731, fn. 2, 748-749 [98 S.Ct. at pp. 3031, 3040]; *Rowan, supra,* 397 U.S. at p. 738 [90 S.Ct. at p. 1491] [emphasizing "the sanctuary of the home"]; cf. *Wilson* v. *Layne* (1999) 526 U.S. 603, 609-610 [119 S.Ct. 1692, 1697, 143 L.Ed.2d 818] ["The Fourth Amendment embodies this centuries-old principle of respect for the privacy of the home . . . ."].) *Bethel School* and *Pacifica* relied also on the presence of children. (*Bethel School, supra,* 478 U.S. at pp. 683-684 [106 S.Ct. at p. 3164]; *Pacifica, supra,* at pp. 731, fn. 2, 749-750 [98 S.Ct. at pp. 3030-3031, 3040-3041].) *Pacifica, Rowan* and *Erznoznik* involved, as well, lewd or indecent speech. (*Pacifica, supra,* at pp. 739-740 [98 S.Ct. at p. 3035]; *Rowan, supra,* at p. 730 [90 S.Ct. at pp. 1487]; *Erznoznik, supra,* 422 U.S. at p. 207 [95 S.Ct. at p. 2271] [ordinance prohibited drive-in theater with screen visible from public street from exhibiting any film portraying nudity].)

The applicability of the captive audience doctrine to harassing speech in the workplace is, moreover, debated by legal commentators. (Compare Volokh, *Workplace Harassment, supra,* 39 UCLA L.Rev. at pp. 1832-1843 [captive audience doctrine should not apply to the workplace], with Sangree,

*No Collision in Sight, supra*, 47 Rutgers L.Rev. at pp. 515-518 [rejecting Professor Volokh's argument], and Volokh, *How Harassment Law Restricts Free Speech, supra*, 47 Rutgers L.Rev. at pp. 571-572 [replying to Professor Sangree]; cf. *Cohen* v. *California, supra*, 403 U.S. at p. 21 [91 S.Ct. at p. 1786] ["Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense."].) Nevertheless, the Supreme Court authority discussed above firmly establishes, at the least, that the relative captivity of an audience is a relevant and important, if not dispositive, factor in determining whether government restrictions on speech in the workplace are permissible under the First Amendment. Applying that concept here, I find that although defendant Lawrence may desire to offer his apparently low opinion of the Latino workers at his place of employment, plaintiffs apparently do not wish to hear it. Further, plaintiffs were not free to walk away easily from Lawrence's speech, avert their eyes, cover their ears or otherwise avoid hearing his unwanted message. I conclude plaintiffs' status as forced recipients of Lawrence's speech lends support to the conclusion that restrictions on his speech are constitutionally permissible in the circumstances at hand, where the regulation of speech is limited solely to the workplace and the offended recipients constitute a captive audience.

### D. *The Injunction Here Is Similar to a Time, Place and Manner Regulation*

A separate, but related, basis for countenancing an injunction in these circumstances is that an injunction restricting speech that creates a racially hostile work environment is analogous to a permissible time, place and manner restriction on speech. As a general matter, speech in even a traditional public forum may be subject to reasonable time, place and manner restrictions. (*Perry, supra*, 460 U.S. at p. 45 [103 S.Ct. at p. 955].) Such restrictions must be content-neutral, serve a significant government interest and "leave open ample alternative channels of communication." (*Ibid.*) In a nonpublic forum, the government may also "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (*Id.* at p. 46 [103 S.Ct. at p. 955].)

Time, place and manner rules generally have been applied to public and nonpublic fora. As a private employer's place of business, defendants' workplace is neither a public nor a nonpublic forum; it is private property. Nevertheless, the Supreme Court has "on at least one occasion applied [the time, place and manner doctrine] to conduct occurring on private property"

(*Barnes* v. *Glen Theatre, Inc.* (1991) 501 U.S. 560, 566 [111 S.Ct. 2456, 2460, 115 L.Ed.2d 504] (plur. opn.), referring to *Renton* v. *Playtime Theatres, Inc.* (1986) 475 U.S. 41 [106 S.Ct. 925, 89 L.Ed.2d 29]), and adapting to a private workplace the rules applicable to nonpublic fora does not seem inconsistent with the basic goals and purposes of the First Amendment. (See *Robinson* v. *Jacksonville Shipyards, Inc.* (M.D.Fla. 1991) 760 F.Supp. 1486, 1535 ["the regulation of discriminatory speech in the workplace constitutes nothing more than a time, place, and manner regulation of speech"].) Private property is rarely dedicated to the purpose of permitting the unrestrained dissemination of speech; common sense suggests that government restrictions on speech that would be impermissible in public and even nonpublic fora may nevertheless be permissible when applied to certain types of private property.[7]

I begin with the state's interest in restricting workplace speech that creates a racially hostile work environment. The state has announced that it is "the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race . . . ." (Gov. Code, § 12920.) The state recognizes that such discrimination "foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general." (*Ibid.*)

Of course, the elimination of racial discrimination, even by private parties or entities, has often been found to be a governmental interest of the highest order. (See, e.g., *Edmonson* v. *Leesville Concrete Co.* (1991) 500 U.S. 614 [111 S.Ct. 2077, 114 L.Ed.2d 660] [exercise of race-based peremptory challenge to juror by private litigant in civil case held unconstitutional]; *Bob Jones University* v. *United States* (1983) 461 U.S. 574 [103 S.Ct. 2017, 76 L.Ed.2d 157] [denial of federal tax benefits for private religious schools with racially discriminatory policy upheld]; *Jones* v. *Mayer Co.* (1968) 392 U.S. 409 [88 S.Ct. 2186, 20 L.Ed.2d 1189] [federal statute barring racial discrimination in sale or rental of private property valid under the Thirteenth Amendment]; *Shelley* v. *Kraemer* (1948) 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441] [enforcement of racially restrictive covenant in private property deed unconstitutional].) In short, the State of California has stated a compelling governmental interest in support of its laws aimed at eliminating racially discriminatory practices in private employment.

---

[7]Indeed, private employers commonly place any number of restrictions on the speech of their employees, from requiring salespersons to speak well of an employer's products to potential customers and instructing restaurant wait staff not to speak ill of the food they are serving, to requiring employees to keep trade secrets confidential.

Restricting Lawrence in the future from engaging in speech that is productive of a racially hostile work environment leaves him ample alternatives for advocating, espousing or simply stating his beliefs. Because I agree with the plurality opinion's affirmance of the Court of Appeal's decision reversing and remanding the case to permit the trial court to "redraft the injunction in a manner that . . . limits its scope to the workplace," a majority of this court agrees the injunction in this case should be limited to speech in the workplace. Lawrence is thus free to speak anywhere and at any time outside of his place of employment, whether it be in his home, on the sidewalk, in the park, in his local restaurant or on the Internet.

*Madsen* v. *Women's Health Center, Inc.* (1994) 512 U.S. 753 [114 S.Ct. 2516, 129 L.Ed.2d 593] (*Madsen*) is illustrative. In that case, protesters picketing an abortion clinic were subject to an injunction that prohibited them from blocking access to the clinic or physically abusing persons entering or leaving it. On finding the injunction to have been violated, the trial court issued a new injunction, providing, inter alia, that demonstrators must (with some exceptions) stay at least 36 feet from clinic driveways and entrances. The demonstrators eventually sought review in the Supreme Court, claiming the new injunction violated their First Amendment rights.

The Supreme Court, although striking down other parts of the injunction, upheld the requirement of a 36-foot buffer zone, finding the limitation was a valid time, place and manner restriction on speech. As pertinent to the question here, the high court noted the "petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36-foot buffer zone." (*Madsen, supra,* 512 U.S. at p. 764, fn. 2 [114 S.Ct. at p. 2524].) If the injunction in the instant case is limited on remand to apply to the workplace only, Lawrence similarly will have open to him ample alternative channels of communication.

The Supreme Court's existing time, place and manner decisions admittedly do not wholly govern this case, for not only does this case not involve a public forum, the injunction here is not content-neutral. "The Supreme Court has stated repeatedly . . . that time, place, and manner regulations must be content neutral in order to receive deferential judicial review." (Fallon, *Sexual Harassment, supra,* 1994 Sup. Ct. Rev. at pp. 16-17, fn. omitted.) "[The] principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.' " (*Madsen, supra,* 512 U.S. at p. 763 [114 S.Ct. at p. 2524].) "We thus look to the government's purpose as the threshold consideration." (*Ibid.* [114 S.Ct. at p. 2523].)

The state's purpose here is the elimination of racial discrimination and harassment at the workplace. FEHA thus is clearly concerned with the content of harassing speech; hence, the injunction cannot be classified as content-neutral. This fact has led some commentators to conclude that reliance on the time, place and manner doctrine in the employment harassment setting is misplaced. (Volokh, *Workplace Harassment, supra,* 39 UCLA L.Rev. at pp. 1826-1828; Browne, *Title VII as Censorship, supra,* 52 Ohio St. L.J. at p. 521.) As noted at the beginning of this opinion, no Supreme Court decision is directly on point; accordingly, we do not know how that court would balance the diverse interests present here.

Whether the content-based nature of the injunction wholly disqualifies the time, place and manner doctrine from any application to this case need not be decided, however. Instead, it is sufficient to consider components of the doctrine as relevant to the overall assessment of whether the injunction violates defendant Lawrence's First Amendment rights. When those components—a compelling state interest and alternative channels of communication—are considered together with the facts the speech sought to be enjoined occurred in the workplace and the recipients of the unwelcome speech were a captive audience, a strong case for upholding the injunction appears.

We must consider the implications of a contrary holding. The state's interest in eradicating racial discrimination in the workplace is compelling, and the state has made a reasonable determination that such discrimination causes "domestic strife and unrest" and is harmful to "the interest of employees, employers, and the public in general." (Gov. Code, § 12920.) The state's interest is fully applicable to this case, as it is undisputed the speech in question occurred at the workplace where both plaintiffs and defendant Lawrence work. Plaintiffs do not wish to listen to Lawrence's constant stream[8] of verbiage denigrating them on account of their Latino heritage, but they are not free, as a practical matter, to leave their jobs to avoid being the targets of his racial slurs. Lawrence, on the other hand, is free to speak his mind anywhere and everywhere, with the sole exception of the workplace.

Diverse interests are in play in this case, and balancing them is undeniably a difficult task. Were we to find the injunction violates Lawrence's First

---

[8]"In determining what constitutes 'sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature. [Citation.]" (*Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 610 [262 Cal.Rptr. 842]; *Muller* v. *Automobile Club of So. California* (1998) 61 Cal.App.4th 431, 446 [71 Cal.Rptr.2d 573] [quoting *Fisher*]; see also *Meritor Savings Bank* v. *Vinson* (1986) 477 U.S. 57, 67 [106 S.Ct. 2399, 2405, 91 L.Ed.2d 49] [finding sexual harassment on the job must be "sufficiently severe or pervasive" before there can be liability under title VII].)

Amendment rights, we would be concluding those rights outweigh the rights of the Latino plaintiffs to be free of unwanted racial discrimination. Like Lawrence's asserted interest in free speech, however, plaintiffs' interest also finds recognition in our federal Constitution (U.S. Const., Amends. XIII, XIV, XV; see *Fitzpatrick* v. *Bitzer* (1976) 427 U.S. 445, 453 & fn. 9 [96 S.Ct. 2666, 2670, 49 L.Ed.2d 614] [Congress exercising powers under section 5 of the 14th Amendment when it passed relevant amendments to title VII]). Given the constellation of factors present in this case, no clear reason appears why Lawrence's free speech rights should predominate over the state's and the individual plaintiffs' similarly weighty antidiscrimination interests.

Balancing Lawrence's First Amendment free speech rights with the equally weighty right of plaintiffs to be let alone at their jobsite, free of racial discrimination, I find the several factors coalescing in this case—speech occurring in the workplace, an unwilling and captive audience, a compelling state interest in eradicating racial discrimination, and ample alternative speech venues for the speaker—support the conclusion that the injunction, if sufficiently narrowed on remand to apply to the workplace only, will pass constitutional muster.

## IV

Having found the injunction, properly narrowed on remand, would not violate the First Amendment, I reach the same result under the California Constitution. Article I, section 2, subdivision (a) of the state Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." We have in the past observed this state constitutional free speech guarantee is "[a] protective provision more definitive and inclusive that the First Amendment" (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]; see also *Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1041 [232 Cal.Rptr. 542, 728 P.2d 1177]) and its plain meaning prohibits prior restraints on speech (*Dailey* v. *Superior Court* (1896) 112 Cal. 94, 100 [44 P. 458]; *Pines* v. *Tomson* (1984) 160 Cal.App.3d 370, 393 [206 Cal.Rptr. 866]). Lawrence argues that even if the injunction is permissible under the federal Constitution, it is invalid under this state constitutional provision, which provides greater protection for speech than is afforded by the First Amendment.

Although the First Amendment is written in absolute terms, it has not been so interpreted. The same is true for article I, section 2, subdivision (a) of the

state Constitution. As we explained in *Wilson* v. *Superior Court, supra*, 13 Cal.3d at pages 661-662: "We do not . . . suggest that prior restraint upon publication can never be justified. The decisions recognize that prior restraints may be imposed under some extraordinary circumstances. For example, it has been said that the government may prohibit the disclosure of military secrets in time of war and prevent the utterance of words that may have the effect of force. [Citation.] Furthermore, an injunction restraining speech may issue in some circumstances to protect private rights (see, e.g., *Magill Bros.* v. *Bldg. Service etc. Union* (1942) 20 Cal.2d 506, 511-512 [127 P.2d 542]) or to prevent deceptive commercial practices (*Securities and Exchange Comn.* v. *Texas Gulf Sulphur Co.* (2d Cir. 1971) 446 F.2d 1301, 1306)." In other words, a sufficiently strong public policy reason can justify a prior restraint on speech even under the heightened protection afforded by the state Constitution.

As with the federal constitutional analysis set forth above, in the state constitutional analysis as well two powerful constitutional interests are at issue. In addition to the protection for one's freedom to "speak, write and publish his or her sentiments on all subjects," the state Constitution—like the Fourteenth Amendment to the federal Constitution—also mandates people not be "denied equal protection of the laws." (Cal. Const., art. I, § 7, subd. (a).) Moreover, just as the state Constitution's free speech guarantee provides greater protection than its federal counterpart, our state charter also provides heightened protection against racial discrimination in the workplace. Article I, section 8 provides "[a] person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of . . . race . . . ." It is thus no answer to observe that free speech rights are greater under the state Constitution, because the same document also grants greater protection against racial discrimination in the workplace. We are once again faced with a difficult balance between competing constitutional values.

The confluence of factors that justifies the limitation on defendant Lawrence's speech under the First Amendment to the United States Constitution supports the same result under the California Constitution. For example, that a potential listener is unable to escape hearing an unwanted message has been cited as a significant factor in the evaluation of free speech rights in this state. In *Braxton* v. *Municipal Court* (1973) 10 Cal.3d 138 [109 Cal.Rptr. 897, 514 P.2d 697], this court found that regulation of bullhorns or loud speakers used in demonstrations was "necessary to prevent substantial interference with the work of captive audiences in classrooms and research facilities." (*Id.* at p. 149.) Similarly, in *City of San Jose* v. *Superior Court* (1995) 32 Cal.App.4th 330 [38 Cal.Rptr.2d 205], the appellate court approved a city ordinance that, in creating a 300-foot buffer zone

around the residences of staff members of an abortion clinic, declared " 'targeted picketing activity creates a "captive audience" situation.' " (*Id.* at p. 341.) Clearly an audience's practical ability to avoid unwelcome or unpleasant speech is relevant to evaluating the validity of an injunction under the state Constitution.

Notwithstanding the heightened protection free speech rights enjoy under the state Constitution, time, place and manner restrictions are also recognized under our state charter. (*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 [153 Cal.Rptr. 854, 592 P.2d 341]; *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 85 [112 Cal.Rptr. 777, 520 P.2d 1]; *Savage* v. *Trammell Crow Co.* (1990) 223 Cal.App.3d 1562, 1572 [273 Cal.Rptr. 302]; *Planned Parenthood* v. *Holy Angels Catholic Church* (N.D.Cal. 1991) 765 F.Supp. 617, 625.) Although the speech here was not uttered in a public forum and the injunction is not content-neutral, I find the two remaining factors in the equation—a significant state interest, and ample alternative avenues of communication—are relevant under the state Constitution.

As noted, the California Constitution itself recognizes the importance of eliminating racial discrimination in the workplace. (Cal. Const., art. I, § 8.) Our Legislature has similarly declared such workplace discrimination odious. (Gov. Code, § 12920 [FEHA]; see also Civ. Code, § 51 ["All persons within the jurisdiction of this state are free and equal, and no matter what their . . . race, . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."].) This court has also observed that the "policy that promotes the right to seek and hold employment free of prejudice is fundamental." (*Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 220 [185 Cal.Rptr. 270, 649 P.2d 912].) State law, both statutory and constitutional, thus recognizes a compelling interest in the elimination of racial discrimination in the workplace.

In short, I find defendants' rights under the California Constitution do not compel the conclusion the injunction must be set aside.

## V

When we leave our homes, we enter a hurly-burly world where we are sometimes required to endure the unpleasant and undesirable opinions and entreaties of others. Unfortunately, such unwelcome speech sometimes attacks us on the basis of our race, gender or ethnic heritage. (See, e.g., *Brandenburg* v. *Ohio, supra,* 395 U.S. 444 [Ku Klux Klan leader made derogatory remarks about African-Americans]; *Contento* v. *Mitchell* (1972)

28 Cal.App.3d 356 [104 Cal.Rptr. 591] [defendant called plaintiff a "bitch" and a "whore"]; *National Socialist Party* v. *Skokie* (1977) 432 U.S. 43 [97 S.Ct. 2205, 53 L.Ed.2d 96] (*per curiam*) [American Nazis wishing to stage parade in predominantly Jewish village].) Ensuring proper breathing room for the airing of diverse views generally requires that we simply close our ears, avert our eyes and move on. The freedom of speech guaranteed by the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." (*United States* v. *Associated Press* (S.D.N.Y. 1943) 52 F.Supp. 362, 372 (opn. of Hand, J.), affd. *sub nom. Associated Press* v. *United States* (1945) 326 U.S. 1 [65 S.Ct. 1416, 89 L.Ed. 2013].)

The workplace is different from sidewalks and parks, however; workers are not so free to leave to avoid undesired messages. When employees are forced to endure racially harassing speech on the job, it is arguable that "substantial privacy interests are being invaded in an essentially intolerable manner." (*Cohen* v. *California, supra,* 403 U.S. at p. 21 [91 S.Ct. at p. 1786].) In enacting FEHA and its related provisions, the state has recognized the damage racial discrimination at the workplace can cause, both economically to society and psychologically to the victimized worker. Finally, the restriction on the harasser seems de minimis because he remains free to state his views and opinions in every place other than his place of employment.

No single factor present in this case justifies the restraint on speech here; indeed, another case posing different facts may lead to a different conclusion. However, for all the reasons stated above, I conclude that Lawrence's speech, even if constitutionally protected, may nevertheless be subject to the modest time and place restrictions discussed above, and that an injunction, properly narrowed on remand,[9] will not violate his right to freedom of speech guaranteed to him by both the First Amendment to the United States Constitution and by article I, section 2, subdivision (a) of the California Constitution.

**MOSK, J.**—I dissent.

The plurality conclude that a remedial injunction under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), banning a list

---

[9]Insofar as the "exemplary list of prohibited derogatory racial or ethnic epithets," which the appellate court directed the trial court to provide, is fashioned in the context of an injunction directed not against individual words per se, but the creation of, or perpetuation of, a racially hostile work environment, I concur in this limitation as well. Such a list should be intended as illustrative and explanatory, rather than prohibiting the mere utterance of specified words regardless of context. In this way, defendants will have additional notice what types of speech are prohibited by the injunction, reducing any potential vagueness that may inhere in an injunction that even partially restricts speech.

of derogatory words from use in the workplace, is a permissible remedy for employment discrimination by defendants John Lawrence and Avis Rent A Car System, Inc. (Avis). I disagree. Among our most cherished constitutional principles is that speech—even if offensive—should be protected unless, and until, it produces a demonstrable harmful effect.

Both the First Amendment of the United States Constitution and article I, section 2, subdivision (a), of the California Constitution restrict the use of content-based prior restraints on speech. The order at issue here—enjoining *any* future use in the workplace of specified words—constitutes just such a prior restraint. It impermissibly restricts speech based on the mere assumption that these words will inevitably create a hostile and abusive work environment amounting to employment discrimination. Nor is this injunction salvaged by labeling it a restraint on *conduct* rather than *speech*.

The plurality's error is particularly glaring because they are deciding this matter in a contextual vacuum, without the benefit of a factual record. They thus overlook the duty of an appellate court, where free speech rights are at stake, to independently review the trial court's findings and the whole record to assure that any injunction is narrowly tailored and justified by compelling necessity. That duty is no less imperative in a matter involving speech in the workplace. As the United States Supreme Court recently emphasized: "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." (*Oncale* v. *Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81-82 [118 S.Ct. 998, 1003, 140 L.Ed.2d 201].) Here, we know nothing of the surrounding circumstances. We do not even know what offensive remarks were made, to whom, or when. All we do know is that the parties have agreed that the remarks did *not* amount to "fighting words"—i.e., that the injunction involves otherwise protected speech—and that Lawrence has apparently not made any similarly offensive remarks to Avis employees since 1992.

Like my colleagues, I abhor discrimination in any form. But I feel equally strongly that we cannot use the instrumentality of the courts to penalize speech before we know what was said, to whom, *and with what effect*. It should be obvious that we may not do so in advance, based only on predictions of future harm.

I

The crux of the plurality opinion is that the injunction forbidding the use of a list of words does not amount to a prior restraint so long as it was issued

after a jury determination of past employment discrimination. It endorses the formulation of amicus curiae American Civil Liberties Union of Northern California that speech was properly enjoined here because "a fair judicial process has determined that a repetitive pattern of speech is unprotected." I am unpersuaded.

"The term 'prior restraint' is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' [Citation.] Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints." (*Alexander* v. *United States* (1993) 509 U.S. 544, 550 [113 S.Ct. 2766, 2771, 125 L.Ed.2d 441].) The injunction here falls squarely within that definition. It was not transformed into something acceptable simply because it was issued after a judicial finding of past employment discrimination.

According to the Chief Justice, the injunction passes constitutional muster because it simply precludes defendants from continuing their unlawful activity. It does more than that. It directly targets otherwise protected speech, forbidding *any* future use of a list of offensive words in the workplace—even outside the presence of plaintiffs and even if welcome or overtly permitted. Although the plurality opinion insists that it would prohibit an illegal course of *conduct*, in fact it regulates *speech* on the basis of expressive content. (See *DeAngelis* v. *El Paso Mun. Police Officers Ass'n.* (5th Cir. 1995) 51 F.3d 591, 597, fn. 7.)

Moreover, it is not true that any and all future use even of offensive epithets will necessarily amount to a continuation of the same unlawful activity. As the plurality opinion concedes, "not every utterance of a racial slur in the workplace violates the FEHA or Title VII [of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)]." (Plur. opn., *ante*, at p. 130; see *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608 [262 Cal.Rptr. 842]; *Harris* v. *Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [114 S.Ct. 367, 370, 126 L.Ed.2d 295] [" '[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee,' [citation] does not sufficiently affect the conditions of employment to implicate Title VII . . . . Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."].) I am not persuaded that a judicial finding that employees were previously subjected to verbal

harassment in violation of FEHA could justify a prior restraint on expression not amounting to "fighting words."[1]

The plurality opinion draws analogies to several United States Supreme Court decisions. None is in point.

Thus, the plurality opinion relies on several decisions involving limited injunctive remedies against the sale or exhibition of obscene materials, including *Kingsley Books, Inc.* v. *Brown* (1957) 354 U.S. 436 [77 S.Ct. 1325, 1 L.Ed.2d 1469], *Times Film Corp.* v. *Chicago* (1961) 365 U.S. 43 [81 S.Ct. 391, 5 L.Ed.2d 403], *Freedman* v. *Maryland* (1965) 380 U.S. 51 [85 S.Ct. 734, 13 L.Ed.2d 649], and *Paris Adult Theatre I* v. *Slaton* (1973) 413 U.S. 49 [93 S.Ct. 2628, 37 L.Ed.2d 446]. Unlike the language at issue here, obscenity is not within the area of constitutionally protected speech. (*Roth* v. *United States* (1957) 354 U.S. 476, 485 [354 U.S. 476, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498].)

The plurality opinion's analogy to *Pittsburgh Press Co.* v. *Human Rel. Comm'n* (1973) 413 U.S. 376 [93 S.Ct. 2553, 37 L.Ed.2d 669] is also unavailing. There, the United States Supreme Court addressed the constitutionality of a restriction on commercial speech in support of an illegal commercial activity. (*Id.* at pp. 388-389 [93 S.Ct. at p. 2560].) Again, the United States Supreme Court emphasized that the order "[did] not endanger arguably protected speech" and did not require the court "to speculate as to the effect of the publication" in the future. (*Id.* at p. 390 [93 S.Ct. at p. 2561].) *Madsen* v. *Women's Health Center, Inc.* (1994) 512 U.S. 753 [114 S.Ct. 2516, 129 L.Ed.2d 593], also relied on by the majority, is inapposite; unlike the speech at issue in *Madsen*, the speech here is not content-neutral, nor can it be said that the injunction burdens no more speech than necessary, since it forbids *any* use of particular words.[2]

By contrast, the injunction at issue constitutes a broad prohibition touching on *core protected speech*. It applies to words that, although offensive,

---

[1]"Fighting words"—"those which by their very utterance inflict injury or tend to incite an immediate breach of the peace"—are not safeguarded by the federal Constitution. (*Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 572 [62 S.Ct. 766, 769, 86 L.Ed. 1031].) Significantly, plaintiffs conceded that the offensive speech at issue here did *not* consist of fighting words; the superior court apparently agreed. Nor did the superior court find any "real and immediate threat of future injury" by Lawrence, who had not harassed anyone at Avis since 1992. (See *Los Angeles* v. *Lyons* (1983) 461 U.S. 95, 107, fn. 8 [103 S.Ct. 1660, 1668, 75 L.Ed.2d 675] ["The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant."].) In the absence of a record, we have no basis to conclude otherwise.

[2]*Auburn Police Union* v. *Carpenter* (1st Cir. 1993) 8 F.3d 886, discussed at length by the plurality, offers no guidance. In that case, which involved a statute barring solicitation for the benefit of law enforcement officers and organizations, there was no injunction before the court; the United States Court of Appeals for the First Circuit observed that without the

may be used to convey ideas or emotions and are therefore shielded by the First Amendment. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." (*Texas* v. *Johnson* (1989) 491 U.S. 397, 414 [109 S.Ct. 2533, 2545, 105 L.Ed.2d 342]; *Cohen* v. *California* (1971) 403 U.S. 15, 26 [91 S.Ct. 1780, 1788, 29 L.Ed.2d 284] ["[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process."].)

Even assuming that the use of derogatory speech can amount to employment discrimination, I disagree that *any future use* even of slurs, vulgarity, or derogatory epithets in the workplace—even by a person who has previously engaged in employment discrimination—can constitutionally be proscribed. That is because the offensive content *and effect* of using any one, or more, of a list of *verboten* words cannot be determined in advance: "The question whether speech is, or is not, protected by the First Amendment often depends on the content of the speech. Thus, the line between permissible advocacy and impermissible incitation to crime or violence depends, not merely on the setting in which the speech occurs, but also on exactly what the speaker had to say. Similarly, it is the content of the utterance that determines whether it is a protected epithet or an unprotected 'fighting comment.' " (*Young* v. *American Mini Theatres* (1976) 427 U.S. 50, 66 [96 S.Ct. 2440, 2450, 49 L.Ed.2d 310], fn. omitted.) For this reason, I would hold that the injunction fails to overcome the heavy presumption against the constitutional validity of prior restraints on speech. (*Vance* v. *Universal Amusement Co.* (1980) 445 U.S. 308, 317 [100 S.Ct. 1156, 1162, 63 L.Ed.2d 413]; *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 657 [119 Cal.Rptr. 468, 532 P.2d 116].)[3]

---

concrete example of a particular injunction, it could not determine whether the prior restraint doctrine had been violated. (*Id.* at p. 904.) The plurality also summarily cite several federal and state law cases upholding injunctions; with a single exception (*Robinson* v. *Jacksonville Shipyards, Inc.* (M.D.Fla. 1991) 760 F.Supp. 1486), none involves a comparable injunction against otherwise protected speech in the workplace. Significantly, *Robinson* has been widely criticized. (See, e.g., Comment, *Freedom of Speech and Workplace Harassment* (1992) 39 UCLA L.Rev. 1791, 1818 ["Thus, in the recent case of [*Robinson*], the district court was wrong . . . ."]; Karner, *Political Speech, Sexual Harassment, and a Captive Workforce* (1995) 83 Cal.L.Rev. 637, 665, fn. 168 ["[T]he *Robinson* court ignored basic [First Amendment] doctrine in reaching this conclusion."].) Nor do any of the cases cited by the plurality analyze the question in light of article I, section 2, subdivision (a), of the California Constitution, which, as discussed *post*, affords broader protection against prior restraints on speech.

[3]I am also unpersuaded by the concurring opinion's attempt to create an exception to the the prohibition against prior restraints in the case of workplace discrimination using "strands of analysis" from United States Supreme Court precedents. The logic of the concurring opinion unravels upon closer scrutiny. Thus, *R.A.V.* v. *St. Paul* (1992) 505 U.S. 377 [112 S.Ct.

## II

But we need look no farther than article I, section 2, subdivision (a), of the California Constitution to resolve this matter: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for abuse of this right. A law may not restrain or abridge liberty of speech or press." As explained in the majority opinion I authored in *Wilson* v. *Superior Court, supra,* 13 Cal.3d at page 658: "A protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press."

California Constitution, article I, section 2, subdivision (a), plainly permits holding Lawrence and Avis responsible for abuse of the right, but not censorship by way of a prior restraint. "The wording of this section is terse and vigorous, and its meaning so plain that construction is not needed. The right of the citizen to freely speak, write, and publish his sentiments is unlimited, but he is responsible at the hands of the law for an abuse of that right. . . . It is patent that this right to speak, write, and publish, cannot be abused until it is exercised, and before it is exercised there can be no responsibility." (*Dailey* v. *Superior Court* (1896) 112 Cal. 94, 97 [44 P. 458]; *Pines* v. *Tomson* (1984) 160 Cal.App.3d 370, 393 [206 Cal.Rptr. 866] ["Although the section does not use the term 'prior restraint,' the plain meaning of the first sentence of article I, section 2, subdivision (a) is that 'sentiments' are protected from any prepublication sanctions, i.e., from all prior restraints."].)

As the dissenting opinion in the Court of Appeal below correctly observed: "Punishment for and suppression of speech are two very different things. . . . No California appellate court has ever held . . . that persons can be subjected to prior restraint on speech, and legally forbidden to speak on pain of fine or being sent to jail, for merely making rude or even immoral comments that might have bad effects on the listener."

---

2538, 120 L.Ed.2d 305] does not, as the concurring opinion asserts, state or imply that any use of derogatory speech in the workplace is unprotected or that a content-based prior restraint such as the one at issue here would pass constitutional muster; nor do the high court's decisions suggest that the workplace may be regarded as a public forum or employees a "captive audience." The concurring opinion's analysis under the California Constitution is equally unpersuasive. Again, in the absence of any sound constitutional basis for exempting this injunction from the restriction against prior restraints, the concurring opinion ignores our precedents in point and, instead, hopelessly attempts to construct a coherent theory from random "strands" of doctrine taken from cases about equal protection, captive audiences, time, place, and manner restrictions, and racial discrimination. Our goal must be to construe constitutional provisions with careful regard to precedent; otherwise the public has little assurance that the court's decisions will not be influenced by its members' personal policy views. (See *People* v. *Jefferson* (1999) 21 Cal.4th 86, 103-104 [86 Cal.Rptr. 893, 980 P.2d 441] (dis. opn. of Werdegar, J.).)

The plurality opinion's attempt to construe *Dailey*—and the California Constitution—narrowly on this point fails. Thus, it relies on *People* ex rel. *Busch* v. *Projection Room Theatre* (1976) 17 Cal.3d 42, 57 [130 Cal.Rptr. 328, 550 P.2d 600], which upheld the constitutionality of an action to abate the sale or display of obscene material as a public nuisance. As I stated at the time, in my view the decision in *Busch* was incorrect; the public nuisance proceedings at issue failed to pass constitutional muster. (See *id.*, at p. 62 (conc. & dis. opn. of Mosk, J.) ["[S]uch proceedings . . . offend article I, section 2, of the California Constitution which prohibits action that may 'restrain or abridge liberty of speech or press.' "]; see also *id.*, at pp. 63-74 (dis. opn. of Tobriner, J.).) It is also distinguishable: it involved exhibition of specific magazines and films adjudged to be obscene, i.e., to constitute unprotected expression. Nor did the majority therein purport to apply, or even cite, California Constitution, article I, section 2, subdivision (a).

The plurality opinion also relies on *Goldin* v. *Public Utilities Commission* (1979) 23 Cal.3d 638 [153 Cal.Rptr. 802, 592 P.2d 289], which, like *Pittsburgh Press Co.* v. *Human Rel. Comm'n*, *supra*, 413 U.S. 376, involved restrictions on commercial speech related to illegal activity—using the telephone to solicit acts of prostitution. The activity was found not to involve protected speech within the meaning of the First Amendment. On those grounds, *Goldin*, too, is distinguishable. Nor, again, did the majority in *Goldin* even address the free speech protections under article I, section 2, subdivision (a).

Finally, the plurality opinion cites *People* ex rel. *Gallo* v. *Acuna* (1997) 14 Cal.4th 1090 [60 Cal.Rptr.2d 277, 929 P.2d 596], which upheld the validity of an injunction restraining future activities of gang members under the common law nuisance laws. I continue to believe that *Gallo* was wrongly decided. (See *id.*, at pp. 1132-1148 (dis. opn. of Mosk, J.).) But, in any event, it is unilluminating: the majority in *Gallo* did not address any question involving prior restraints on speech; nor did *Gallo* involve any application whatsoever of California Constitution, article I, section 2.[4]

The plurality express a concern that unless an injunction issues in this matter, plaintiffs will be confined to bringing repetitive lawsuits. I hope that

---

[4]The First Amendment issue addressed in *Gallo* involved not free speech, as the plurality here erroneously suggest, but freedom of association, i.e., an injunction against " '[s]tanding, sitting, walking, driving, gathering or appearing anywhere in public view with any other defendant' " or any other gang member. (*People* ex rel. *Gallo* v. *Acuna*, *supra*, 14 Cal.4th at p. 1110, italics omitted.) The underlying injunction issued by the superior court in *Gallo* also prohibited the use of words, phrases, physical gestures, or symbols, or engaging in other forms of communication that described the gang; it also forbade the wearing of clothing bearing the name or letters of the gang. (See *id.*, at p. 1136, fn. 3 (dis. opn. of Mosk, J.) [quoting injunction].) Those provisions of the injunction, however, were stricken as unconstitutional by the Court of Appeal, and its holding on this point was not challenged on review by this court.

would not result. However, a mere policy consideration is of little weight in light of the strong presumption against prior restraints.

In any event, I disagree that the threat of repetitive litigation would be less effective in terms of avoiding future workplace discrimination by Avis than the possibility that an individual supervisor will be jailed for contempt. As the damages action in this matter demonstrates, speech may be subject to strong sanctions under FEHA if it amounts to employment discrimination. Faced with the high costs of defending against such suits—including compensatory damages, attorney fees, and punitive damages—employers like Avis are likely to regard it as a potent remedy indeed.

### III

For the foregoing reasons, I would reverse the judgment of the Court of Appeal.

**KENNARD, J.**—I dissent.

Constitutional free speech guarantees are in undeniable tension, if not conflict, with the statutory rights of employees to be free from discriminatory verbal harassment that creates a hostile work environment. Although this tension has generated lively debate in scholarly legal journals, the United States Supreme Court has yet to address the issue. This case presents one aspect of the problem: the use of injunctions prohibiting certain kinds of future speech, on the basis of its content, as a remedy for hostile environment employment discrimination.

As I will explain, the particular content-based injunction at issue here, both as drafted by the trial court and as modified by the Court of Appeal, is invalid under the free speech guarantees of both the federal and state Constitutions because the record fails to establish that an injunction restricting future speech is necessary to prevent a recurrence of the wrongful acts of employment discrimination. Moreover, even assuming a need for some content-based speech restriction could be shown, the injunction here is invalid because it is not narrowly drawn to target only the prohibited discrimination.

These defects are not curable. In particular, the Court of Appeal's proposal to amend the injunction by adding a list of forbidden "bad words" will not make the injunction any less an abridgment of the right of free speech. Indeed, I question whether *any* injunction prohibiting workplace expression of particular views, however abhorrent those views, can be reconciled with

constitutional free speech guarantees: "[U]nder our system of government we may not prohibit the dissemination of views simply because they are controversial, distasteful, or disturbing. To sanction such a prohibition 'would be a complete repudiation of the philosophy of the Bill of Rights.' [Citation.]" (*Planned Parenthood Shasta-Diablo, Inc.* v. *Williams* (1995) 10 Cal.4th 1009, 1027 [43 Cal.Rptr.2d 88, 898 P.2d 402] (dis. opn. of Kennard, J.).)

# I

Seventeen employees brought this action claiming employment discrimination in violation of the state Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). They named as defendants their common employer, Avis Rent A Car System, Inc. (Avis), and 10 Avis employees, one of whom was John Lawrence. Of relevance to the issue raised here, plaintiffs alleged that Avis had employed them as drivers and that Lawrence, who was assigned to Avis's service station at the San Francisco International Airport, created a hostile work environment by verbally harassing and demeaning them "on the basis of their race, national origin and lack of English language skills." They also alleged that Kathy Black, an Avis supervisor, had conducted a discriminatory investigation of an alleged theft.

For reasons not disclosed by the appellate record, the case proceeded to trial as to only 12 of the 17 plaintiffs. By special verdicts, the jury found that Lawrence had unlawfully harassed and discriminated against four of these plaintiffs, three of whom Black had also discriminated against. With respect to three of these four plaintiffs, the jury found that Avis knew or should have known of Lawrence's conduct and failed to stop it. The jury awarded $25,000 in emotional distress damages to each of the three plaintiffs against whom both Lawrence and Black had discriminated, but it awarded no damages to the plaintiff against whom Lawrence alone had discriminated.

After the jury returned these special verdicts, the trial court decided to grant injunctive relief. Interpreting the special verdicts as findings that Lawrence had "engaged in acts of harassment so continual and severe as to alter the working conditions" for the four plaintiffs, the court found "a substantial likelihood based on his actions that he will do so in the future unless restrained." Referring to Lawrence, the court said that "[i]f he has done it four times against four Latinos, there is a substantial likelihood that he will do it again . . . ." But neither the plaintiff nor the court disputed the representations of defendants' attorney that only one of the plaintiffs still worked for Avis in San Francisco and that Lawrence had not engaged in any harassment during the pendency of the lawsuit. Defendants Avis and

Lawrence objected that the proposed injunction was an unconstitutional abridgment of their free speech rights, but the court overruled these objections.

The trial court found that Lawrence's discriminatory acts had consisted of offensive touching and the utterance of derogatory racial or ethnic epithets. As here relevant, the trial court granted a permanent injunction prohibiting Lawrence "from using any derogatory racial or ethnic epithets directed at, or descriptive of, Hispanic/Latino employees of [Avis]" and also "from any uninvited intentional touching of said Hispanic/Latino employees, as long as he is employed by [Avis] in California." The injunction prohibited Avis from "allowing defendant John Lawrence to commit any [such] acts . . . under circumstances in which it knew or should have known of such acts . . . ."

Lawrence and Avis appealed from the portion of the judgment granting the permanent injunction. The Court of Appeal found the injunction overbroad insofar as it restricted Lawrence's activities other than at the workplace, and it found the injunction vague in its prohibition against "derogatory racial or ethnic epithets." To cure these defects, the Court of Appeal reversed and remanded to permit the trial court to redraft the injunction to limit its scope to the workplace and to add "an exemplary list of prohibited derogatory racial or ethnic epithets, specifying epithets such as those actually used in the workplace by Lawrence."

To determine whether the injunction, even as limited by the Court of Appeal, is an unconstitutional abridgment of constitutional free speech rights, this court granted the petition for review filed by defendants Avis and Lawrence.

## II

The First Amendment to the federal Constitution, made applicable to the states by the Fourteenth Amendment (*Near* v. *Minnesota* (1931) 283 U.S. 697, 732 [51 S.Ct. 625, 637, 75 L.Ed. 1357]), declares that "Congress shall make no law . . . abridging the freedom of speech . . . ." This First Amendment free speech guarantee restricts not only the power of legislatures to enact laws of general applicability but also the authority of courts to issue injunctions as remedies for violations or threatened violations of a legislative or judicial decree. (*Madsen* v. *Women's Health Center, Inc.* (1994) 512 U.S. 753, 764 [114 S.Ct. 2516, 2524, 129 L.Ed.2d 593].) Indeed, because injunctions "carry greater risks of censorship and discriminatory application than do general ordinances," the United States Supreme Court

requires "a somewhat more stringent application of general First Amendment principles" to injunctions restricting speech. (*Id.* at pp. 764-765 [114 S.Ct. at p. 2524].)

An injunction that regulates speech on the basis of its topic is termed a content-based regulation and is presumptively invalid. (*Rosenberger* v. *Rector and Visitors of Univ. of Va.* (1995) 515 U.S. 819, 828 [115 S.Ct. 2510, 2516, 132 L.Ed.2d 700]; *R.A.V.* v. *St. Paul* (1992) 505 U.S. 377, 382 [112 S.Ct. 2538, 2542-2543, 120 L.Ed.2d 305].) An injunction that regulates speech on the basis of the particular views or biases that the speaker expresses about a topic is termed a viewpoint regulation and is likewise presumptively invalid, because the United States Supreme Court regards viewpoint discrimination as "an egregious form of content discrimination." (*Rosenberger* v. *Rector and Visitors of Univ. of Va., supra,* at p. 829 [115 S.Ct. at p. 2516].)

An injunction that regulates speech on the basis of its content or viewpoint is scrutinized more strictly than a content-neutral injunction. (*Madsen* v. *Women's Health Center, Inc., supra,* 512 U.S. 753, 762-763 [114 S.Ct. 2516, 2523].) If an injunction is based on content or viewpoint, the proponent ordinarily must show both that the injunction is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." (*Perry Ed. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37, 45 [103 S.Ct. 948, 955, 74 L.Ed.2d 794]; see *Madsen* v. *Women's Health Center, Inc., supra,* at pp. 763-764 [114 S.Ct. at p. 2524].)

The injunction at issue here is based on both content and viewpoint. It is based on content because it prohibits speech for its communicative impact— its potential to offend the person who hears it. (*Reno* v. *American Civil Liberties Union* (1997) 521 U.S. 844, 867-868 [117 S.Ct. 2329, 2342-2343, 138 L.Ed.2d 874]; *Forsyth County* v. *Nationalist Movement* (1992) 505 U.S. 123, 134 [112 S.Ct. 2395, 2403-2404, 120 L.Ed.2d 101]; *Texas* v. *Johnson* (1989) 491 U.S. 397, 411-412 [109 S.Ct. 2533, 2543-2544, 105 L.Ed.2d 342].) It is based on viewpoint because it prohibits the utterance of "derogatory racial or ethnic epithets," words that convey and embody a particular bias. (*R.A.V.* v. *St. Paul, supra,* 505 U.S. 377, 391-393 [112 S.Ct. 2538, 2547-2548] [state may not prohibit only those fighting words expressing a viewpoint of racial intolerance].)

The state may prohibit racial or ethnic *discrimination* in housing and employment. Indeed, it has a compelling interest in doing so. (See *R.A.V.* v. *St. Paul, supra,* 505 U.S. 377, 395 [112 S.Ct. 2538, 2549]; *Walnut Creek Manor* v. *Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 273 [284

Cal.Rptr. 718, 814 P.2d 704] (dis. opn. of Kennard, J.).) Although the state may adopt various means to combat racial and ethnic bias in general, antidiscrimination measures collide with the First Amendment when they attempt to combat racial and ethnic bias by "silencing speech on the basis of its content" (*R.A.V.* v. *St. Paul, supra,* 505 U.S. 377, 392) or by "handicap-[ping] the expression of particular ideas" (*id.* at p. 394 [112 S.Ct. 2538, 2548])., The proper test to determine the validity of the content- and view-point-based injunction at issue here is whether its restriction on speech is necessary to serve a compelling state interest and narrowly drawn to achieve that end. (*Perry Ed. Assn.* v. *Perry Local Educators' Assn., supra,* 460 U.S. 37, 45 [103 S.Ct. 948, 955].)

The state has a compelling interest in eradicating invidious employment discrimination (see *R.A.V.* v. *St. Paul, supra,* 505 U.S. 377, 395 [112 S.Ct. 2538, 2549-2550), and the injunction here surely *promotes* that interest (see *ibid.*), but plaintiffs have not shown that the injunction here is *necessary* to serve that interest. An award of damages for proven employment discrimination is a presumptively adequate and content-neutral alternative, particularly for a first time offender. So far as the record shows,[1] this is the first case in which damages have been awarded against Lawrence or Avis for employment discrimination. Only one Avis employee, Lawrence, was found to have caused an abusive work environment by using racial or ethnic slurs, and he did so as to only four of the original seventeen plaintiffs. The harassment was confined to a limited time period and ceased after plaintiffs filed this lawsuit. Thus, there is no basis upon which to conclude that damages will not have the desired deterrent effect. (See *Intern. Soc. for Krishna Consciousness* v. *Eaves* (5th Cir. 1979) 601 F.2d 809, 833 [rejecting the view that a speech restraint may be based on the generalization that one who has violated a law once is likely to do so again].) The trial court's assertion that an injunction is necessary is entirely speculative.

Even assuming for the sake of argument that injunctive relief were necessary, the record does not demonstrate the necessity of an injunction restricting speech. The trial court found that Lawrence's harassment had consisted of both offensive touching and the use of racial and ethnic epithets. The jury's special verdicts do not specify whether the employment discrimination findings were based on the offensive touching, the epithets, or a combination of the two. The record contains no finding by the jury or by the

---

[1] I disagree with the plurality that the appellate record, which includes the pleadings, the jury's special verdicts, and all postverdict proceedings relating to issuance of the injunction, is inadequate to determine the constitutionality of the injunction or requires this court to indulge in presumptions, belied by the record before us, that the injunction is necessary and narrowly tailored.

trial court that the utterance of epithets alone created a hostile work environment for any Avis employee. Lawrence and Avis do not challenge the portion of the injunction prohibiting uninvited intentional touching. Nothing in the record shows that enforcement of this portion of the injunction, and the portion of the injunction concerning the nonspeech activities of Avis supervisor Kathy Black, will not be effective to prevent a recurrence of the hostile environment employment discrimination.

Nor is the injunction narrowly drawn to prevent a recurrence of a hostile work environment for plaintiffs. For First Amendment purposes, a regulation is narrowly drawn "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." (*Frisby* v. *Schultz* (1988) 487 U.S. 474, 485 [108 S.Ct. 2495, 2503, 101 L.Ed.2d 420].) "A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." (*Ibid.*)

Here, the injunction prohibits Lawrence from addressing epithets to *any* Hispanic employee, not just the four plaintiffs (only one of whom still works for Avis) whom Lawrence was found to have harassed. This is not a class action, a criminal prosecution, or a civil enforcement action by government; it is a civil action by individual private plaintiffs. I am aware of no authority permitting a trial court, in a civil action by individual plaintiffs, to award equitable relief in favor of persons who are strangers to the proceeding.

Also, the injunction prohibits Lawrence not only from addressing racial and ethnic epithets to Hispanic employees, but also from using those epithets as descriptive of these employees. The latter prohibition, because it applies even to statements made outside the hearing and knowledge of any Hispanic employee, encompasses speech unlikely to contribute in any way to a hostile work environment for plaintiffs. Thus, the injunction is an invalid infringement of free speech rights because it prohibits expressive activity that is not the precisely targeted evil of employment discrimination against plaintiffs.

Even if the injunction were narrowed to prohibit Lawrence only from directing epithets at the workplace to the particular Avis employees he previously harassed, it would still prohibit more speech than necessary. As the Chief Justice concedes, "not every utterance of a racial slur in the workplace violates the FEHA." (Plur. opn., *ante*, at p. 130.) An isolated use of an epithet, however odious, does not produce a hostile work environment. To establish employment discrimination by verbal harassment, the employee must show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment . . . .' " (*Harris* v. *Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [114 S.Ct. 367, 370, 126 L.Ed.2d 295] [enunciating this standard for hostile environment employment discrimination under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)]; *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608 [262 Cal.Rptr. 842] [adopting same standard for claims under FEHA].) An injunction prohibiting *every* utterance of a racial or ethnic insult in the workplace, not just utterances that actually produce a hostile work environment, is not narrowly drawn to serve the state's compelling interest in eliminating employment discrimination.

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." (*Harris* v. *Forklift Systems, Inc., supra,* 510 U.S. 17, 23 [114 S.Ct. 367, 371.) For this reason, I question whether any injunction prohibiting specifically identified speech, without regard to its frequency, its context, or its effect on any employee, could survive the strict scrutiny the First Amendment requires for injunctions restricting speech on the basis of content and viewpoint.

Also, as Justice Mosk points out in his dissent, a content-based injunction restricting workplace speech would appear necessarily and invariably to be an invalid prior restraint. "The term 'prior restraint' is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.' . . . [P]ermanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." (*Alexander* v. *United States* (1993) 509 U.S. 544, 550 [113 S.Ct. 2766, 2771, 125 L.Ed.2d 441], italics omitted.) The injunction at issue here certainly fits this definition of a prior restraint.

The First Amendment "accords greater protection against prior restraints than it does against subsequent punishment for a particular speech." (*Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 589 [96 S.Ct. 2791, 2817, 49 L.Ed.2d 683] (conc. opn. of Brennan, J.).) The particular disfavor for prior restraints is based on "a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." (*Southeastern Promotions, Ltd.* v. *Conrad* (1975) 420 U.S. 546, 559 [95 S.Ct. 1239, 1246-1247, 43 L.Ed.2d 448], italics in original.) Although not invalid per se, prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." (*Nebraska Press Assn.* v. *Stuart, supra,* 427 U.S. 539, 559 [96 S.Ct. 2791, 2803].)

A prior restraint is subject to a "heavy presumption against its constitutional validity." (*Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 70 [83 S.Ct. 631, 639, 9 L.Ed.2d 584].) Anyone seeking to defend a prior restraint "thus carries a heavy burden of showing justification for the imposition of such a restraint." (*Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419 [91 S.Ct. 1575, 1578, 29 L.Ed.2d 1].) Although the United States Supreme Court has not stated precisely what this "heavy burden" entails, it apparently includes at least a showing that the prohibited speech is "overwhelmingly likely" to be subject to regulation without violating the First Amendment (*Intern. Soc. for Krishna Consciousness* v. *Eaves, supra,* 601 F.2d 809, 833) and that it will "surely result in direct, immediate, and irreparable damage" (*New York Times Co.* v. *United States* (1971) 403 U.S. 713, 730 [91 S.Ct. 2140, 2149, 29 L.Ed.2d 822] (conc. opn. of Stewart, J.); see also Tribe, American Constitutional Law (2d ed. 1988) § 12-36, pp. 1045-1051).

Because isolated remarks seldom, if ever, cause a hostile work environment, and because determining the existence of a hostile work environment requires an examination of all relevant circumstances, it is impossible to demonstrate in advance that any particular workplace speech will create a hostile work environment (and thus potentially be subject to regulation without violating the First Amendment), much less that it will produce direct, immediate, and irreparable injury. Accordingly, the conclusion seems inescapable that injunctions prohibiting any future offensive workplace speech on the basis of content and viewpoint are invariably and necessarily unconstitutional prior restraints on speech.

### III

The Chief Justice's plurality opinion does not treat the injunction at issue here as a prior restraint, nor does it apply the strict test that the United States Supreme Court has mandated for content- and viewpoint-based injunctions. It suggests various reasons why a less rigorous test is appropriate, and plaintiffs and amici curiae offer other reasons. I consider these reasons in turn.

Preliminarily, I note that an otherwise content-neutral statute or injunction may prohibit speech falling within certain narrowly defined categories—such as obscenity, defamation, and "fighting words"—without meeting any separate compelling interest test. (See *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 572 [62 S.Ct. 766, 769, 86 L.Ed. 1031].) The "fighting words" category is quite narrow (see *Gooding* v. *Wilson* (1972) 405 U.S. 518 [92 S.Ct. 1103, 31 L.Ed.2d 408]), however, and it is conceded that the speech at

issue here is outside this category. Nor is any contention advanced that the speech at issue here may be prohibited as obscene or defamatory. Also, for purposes of deciding what First Amendment test to apply, it makes no difference that a content-based injunction prohibits speech at only one location, here the workplace. (See *Reno* v. *American Civil Liberties Union, supra,* 521 U.S. 844, 880 [117 S.Ct. 2329, 2349] [" 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place' "]; *Consolidated Edison Co.* v. *Public Serv. Comm'n* (1980) 447 U.S. 530, 541, fn. 10 [100 S.Ct. 2326, 2335, 65 L.Ed.2d 319] ["we have consistently rejected the suggestion that a government may justify a content-based prohibition by showing that speakers have alternate means of expression"].)

Under what some commentators have termed the "captive audience doctrine," the United States Supreme Court in a few instances has acknowledged the legitimate interests of persons who would prefer to avoid exposure to unwelcome speech but are unable to do so. (See, e.g., *Frisby* v. *Schultz, supra,* 487 U.S. 474, 487 [108 S.Ct. 2495, 2503-2504]; *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298 [94 S.Ct. 2714, 41 L.Ed.2d 770].) Plaintiffs here argue that because employees are generally unable to avoid exposure to the offensive workplace speech of coworkers and supervisors, a court should be permitted to enjoin all offensive discriminatory speech, regardless of its effect on any particular employee, at any workplace where hostile environment employment discrimination has been demonstrated.

This argument reads more into the captive audience doctrine than the decisions of the United States Supreme Court permit. Under those decisions, a court may impose a content-based restriction to protect unwilling listeners from offensive speech only in the "narrow circumstances" where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure" and " 'substantial privacy interests are being invaded in an essentially intolerable manner.' " (*Erznoznik* v. *City of Jacksonville* (1975) 422 U.S. 205, 209-210 [95 S.Ct. 2268, 2272-2273, 45 L.Ed.2d 125].) Even when listener "captivity" is demonstrated, a court may not prohibit all insulting, disturbing, or offensive speech, but only speech that invades a substantial interest in an intolerable manner. An employee surely has a substantial interest in a work environment that is not hostile or abusive, but this interest is invaded in an intolerable manner only when harassing speech actually produces a hostile or abusive environment. Because the injunction here prohibits even isolated use of racial and ethnic slurs having no demonstrable effect on any plaintiff, it cannot be saved by invoking the captive audience doctrine.

Moreover, in one important respect the work environment is different from other captive audience situations that the United States Supreme Court

has considered: While it is true that during working hours an employee is not free to go elsewhere to avoid hearing a coworker's offensive speech, it is equally true that the coworker is not free to go elsewhere to express his or her views. Although the United States Supreme Court has upheld content-neutral prohibitions on residential picketing (see *Frisby* v. *Schultz, supra,* 487 U.S. 474, 487 [108 S.Ct. 2495, 2503-2504] [upholding ordinance regulating residential picketing]; but see also *Carey* v. *Brown* (1980) 447 U.S. 455, 470-471 [100 S.Ct. 2286, 2295, 65 L.Ed.2d 263] [striking down content-based residential picketing ordinance]), it has never applied the captive audience doctrine to, for example, a content-based regulation prohibiting homeowners from posting signs offensive to their neighbors, such as the ordinance at issue in *R.A.V.* v. *St. Paul, supra,* 505 U.S. 377. (See also *City of Ladue* v. *Gilleo* (1994) 512 U.S. 43 [114 S.Ct. 2038, 129 L.Ed.2d 36] [holding that ordinance banning almost all residential signs violated First Amendment].) If the captive audience doctrine has any application to the work environment, it must be applied in a manner that acknowledges and accommodates the legitimate rights of both the captive speaker and the captive listener. (See Strauss, *Redefining the Captive Audience Doctrine* (1991) 19 Hastings Const. L.Q. 85, 116-119 [suggesting consideration of three factors: the extent of the listener's "captivity," the seriousness of the threatened harm to the unwilling listener, and the degree to which restrictions burden the speaker's legitimate First Amendment interests].) A blanket prohibition on offensive epithets, regardless of the effect on any listener, surely gives insufficient consideration to the legitimate speech interests of the captive speaker.

In a footnote containing its only reference to this dissent, the Chief Justice's plurality opinion cites two federal appellate decisions for the proposition "when a repeated course of conduct has been found to constitute a nuisance or unlawful employment practice, a court is authorized to enjoin future individual acts that are likely to continue or perpetuate the nuisance or unlawful practice." (Plur. opn., *ante,* at p. 146, fn. 9.) But neither of the cited decisions addresses any issue under the First Amendment. (See *People* v. *Scheid* (1997) 16 Cal.4th 1, 17 [65 Cal.Rptr.2d 348, 939 P.2d 748] [an appellate opinion is not authority on issues not considered].) I agree that when free speech concerns are *not* implicated, courts have broad equitable powers to issue injunctions to halt proven patterns of illegal activity. For this reason, I do not question the portion of the injunction here prohibiting Lawrence from engaging in offensive touching, because this portion of the injunction does not restrict speech. But the portion of the injunction prohibiting Lawrence from using offensive epithets *does* restrict speech, and it does so on the basis of content and viewpoint. As I have explained, the First Amendment, as authoritatively construed by the United States Supreme

Court, treats such injunctions as presumptively invalid and requires courts to subject them to an exacting form of scrutiny that this injunction cannot withstand.

Insofar as he deigns to consider the First Amendment at all, the Chief Justice may be understood to argue that once a court has fully and fairly determined that a person has engaged in speech that contributed to a hostile work environment for a particular employee, a court may, without violating the First Amendment, prohibit that person not only from causing the same harm to the same employee by the same speech, but also from engaging in any similar speech that *might* cause similar harm to any similar employee. The Chief Justice suggests that an injunction is not an invalid prior restraint if it is remedial in this sense.

Isolated remarks by individual justices of the United States Supreme Court suggest there may be some sort of "remedial injunction" exception to the general prohibition against prior restraints. (See, e.g., *Madsen* v. *Women's Health Center, Inc., supra,* 512 U.S. 753, 778-779 [114 S.Ct. 2516, 2531] (conc. opn. of Souter, J.); but see also *id.* at p. 794, fn. 1 [114 S.Ct. at p. 2539] (conc. and dis. opn. of Scalia, J.) [questioning whether judicial abridgment of First Amendment rights may be imposed as a sanction for misconduct].) But the high court's decisions do not support the broad proposition that viewpoint-based remedial injunctions are exempt from strict First Amendment scrutiny simply because they are issued against a person who has once been found to have engaged in speech that produced or contributed to a hostile work environment.

The Chief Justice here seems to rely in particular on *Pittsburgh Press Co.* v. *Human Rel. Comm'n* (1973) 413 U.S. 376 [93 S.Ct. 2553, 37 L.Ed.2d 669], in which the high court upheld an injunction prohibiting commercial speech proposing unlawful commercial transactions. A newspaper had segregated its "help wanted" classified advertisements into separate columns for men's jobs and women's jobs. The injunction prohibited this practice as violating a local antidiscrimination ordinance. Rejecting a claim that the injunction was an invalid prior restraint on speech, the court reasoned that the ordinance prohibiting segregation of employment advertisements on the basis of sex was itself a valid prohibition of sexual discrimination, that the injunction went into effect only after a full and final determination that the newspaper had violated the ordinance, and that the injunction did no more than prohibit the very conduct determined to be unlawful. (*Id.* at pp. 389-390 [93 S.Ct. at p. 2561].) Because the injunction's prohibition extended only to commercial speech already determined to be unprotected by the First Amendment, and because this determination did not turn on the publication's

actual effect on particular jobseekers, the court observed that "this is not a case in which the Court is asked to speculate as to the effect of publication." (*Id.* at p. 390 [93 S.Ct. at p. 2561].)

Here, by contrast, the speech at issue is *not* commercial speech, and the determination of employment discrimination *does* turn on the *effect* of the prohibited speech on particular employees, because racial and ethnic slurs in the workplace cause employment discrimination only if they have the *effect* of producing a hostile work environment, which in turn depends upon, among other things, the subjective emotional impact of the speech on the employees claiming discrimination. Because a finding of hostile environment discrimination turns on the effect of particular speech, and because this court cannot know in advance what effect future speech will have, this court *is* asked to speculate as to the effect of the expression that the injunction prohibits.

To take a different example, if a newspaper has maliciously published a defamatory statement about a public figure, as determined by a jury after a full and fair trial, some (but not all) courts would permit issuance of an injunction prohibiting the newspaper from again publishing the very same defamatory statement. (See *Kramer* v. *Thompson* (3d Cir. 1991) 947 F.2d 666, 675-676 [discussing various appellate decisions on this point].) To my knowledge, however, no court has ever so much as suggested that in this situation a court could enjoin the newspaper from publishing other derogatory statements about the same public figure, on the theory that these statements *might* prove to be defamatory and their prohibition would serve a remedial purpose.

To take another example that the high court has specifically addressed, once a movie theater has shown a film that is obscene, as determined by a jury following a full and fair trial, a trial court may thereafter enjoin the theater from exhibiting that film (*Paris Adult Theatre I* v. *Slaton* (1973) 413 U.S. 49, 54-55 [93 S.Ct. 2628, 2633-2634, 37 L.Ed.2d 446]), but it may *not* enjoin the theater from exhibiting other films based on a court's preliminary determinations that they *might* be obscene. (*Vance* v. *Universal Amusement Co.* (1980) 445 U.S. 308, 311 [100 S.Ct. 1156, 1153-1159, 63 L.Ed.2d 413].) Rather, a final adjudication of obscenity is required before a court may enjoin exhibition of a film.

Speech having only the potential to cause hostile environment employment discrimination deserves at least as much protection as speech that is potentially obscene or defamatory, two types of speech that are categorically proscribable under the First Amendment. An employer who has engaged in

or permitted discriminatory verbal harassment that produced a hostile work environment, as determined by a jury following a full and fair trial, may not thereafter be enjoined from engaging in or permitting similar offensive speech on the theory that it *might* again produce a hostile work environment. Any injunction that restricts speech on the basis of viewpoint, even one issued to remedy past discrimination and to prevent its recurrence, must narrowly target the evil of employment discrimination and not prohibit more speech than necessary.

## IV

Article I, section 2, of the California Constitution declares: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." I agree with Justice Mosk that, for the reasons cogently stated in part II of his dissenting opinion, the injunction at issue here violates our state constitutional free speech guarantee, which is "more definitive and inclusive" than the federal provision. (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116].)

## V

Employees expect and deserve effective protection against invidious discrimination at work. Federal and state statutes provide this protection. But when the alleged discrimination consists of verbal harassment by a co-worker, the statutory right to equal employment opportunity comes into conflict with constitutional free speech guarantees. Employees do not surrender constitutional free speech rights when they go to work. "[T]o wholly exclude workplace speech from the realm of the First Amendment would immeasurably impoverish the freedom of expression in this society. For many people, there is no other time or place in their lives in which they can talk about public issues, personal problems, and spiritual concerns with individuals from diverse backgrounds and perspectives." (Estlund, *The Architecture of the First Amendment and the Case of Workplace Harassment* (1997) 72 Notre Dame L.Rev. 1361, 1375; see also Comment, *Political Speech, Sexual Harassment, and a Captive Workforce* (1995) 83 Cal.L.Rev. 637, 646 ["it is arguable that today more political speech occurs at the workplace than in the public square"].) And, as Justice Holmes reminds us, "we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country." (*Abrams* v. *United States* (1919) 250 U.S. 616, 630 [40 S.Ct. 17, 22, 63 L.Ed. 1173] (dis. opn. of Holmes, J.).)

Our employment discrimination law attempts to resolve the conflict by permitting an employee to recover damages for discriminatory verbal harassment, but only if, viewed against the totality of the circumstances, the harassment is so severe or pervasive as to create a hostile or abusive work environment. Although some have questioned whether this standard sufficiently protects freedom of speech (see, e.g., Comment, *Freedom of Speech and Workplace Harassment* (1992) 39 UCLA L.Rev. 1791), the standard's validity is not at issue here. What is at issue is whether a trial court, after a finding of hostile environment employment discrimination, may upset the legislatively defined balance, tilting it decidedly to one side, by prohibiting future use of even isolated epithets without regard to their effect on any employee. Unlike the plurality, I would hold that an injunction so drawn violates the free speech guarantees of the state and federal Constitutions. For this reason, I dissent.

**BROWN, J.,** Dissenting.—In America, Father Terminiello can give a speech in which he describes the crowd outside the auditorium as " 'imported from Russia' " (*Terminiello* v. *Chicago* (1949) 337 U.S. 1, 19 [69 S.Ct. 894, 902, 93 L.Ed. 1131] (dis. opn. of Jackson, J.)) and then adds, "I speak of the Communistic Zionistic Jew . . . . We don't want them here; we want them to go back where they came from." (*Id.* at p. 21 [69 S.Ct. at p. 903].) In America, Clarence Brandenburg can attend a Ku Klux Klan rally, stand near a large burning cross wearing a hood, and give a speech saying, " 'Personally, I believe the nigger should be returned to Africa, the Jew returned to Israel.' " (*Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447 [89 S.Ct. 1827, 1829, 23 L.Ed.2d 430].) In America, Nazis can march through the streets of the predominately Jewish community of Skokie, Illinois, wearing uniforms and displaying swastikas. (*National Socialist Party* v. *Skokie* (1977) 432 U.S. 43 [97 S.Ct. 2205, 53 L.Ed.2d 96]; see also *Collin* v. *Smith* (7th Cir. 1978) 578 F.2d 1197, cert. den. 439 U.S. 916 [99 S.Ct. 291, 58 L.Ed.2d 264].) In each instance, racist and discriminatory views are being expressed. Nevertheless, these expressions are protected by the First Amendment to the federal Constitution and by our state Constitution. We as a nation so value the free exchange of ideas that we are willing to tolerate even offensive ideas, knowing that "one man's vulgarity is another's lyric" (*Cohen* v. *California* (1971) 403 U.S. 15, 25 [91 S.Ct. 1780, 1788, 29 L.Ed.2d 284]) and today's heretical idea may become tomorrow's gospel.

"[T]ime has upset many fighting faiths." (*Abrams* v. *United States* (1919) 250 U.S. 616, 630 [40 S.Ct. 17, 22, 63 L.Ed. 1173] (dis. opn. of Holmes, J.).) For example, the abolition of slavery, women's suffrage, and even a solar-centric solar system were once controversial ideas, but today are considered conventional wisdom. Some ideas—like bigotry and prejudice—

have been wrong from the beginning and always will be. And when we are confronted with bigotry, our visceral reaction is to strike back hard, which in this case took the form of the tough injunction the court upholds today. But hostility, hatred, jealousy, resentment, envy, and vengefulness are passions as old as humankind and, though the expression of such sentiments may cause much misery and mischief, hateful thoughts cannot be quelled at too great a cost to freedom. "That at any rate is the theory of our Constitution." (*Ibid.*)

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable" (*Texas* v. *Johnson* (1989) 491 U.S. 397, 414 [109 S.Ct. 2533, 2545, 105 L.Ed.2d 342])—that is, until today. Today, this court holds that an idea that happens to offend someone in the workplace is "not constitutionally protected." (Plur. opn., *ante,* at p. 137.) Why? Because it creates a "hostile . ... work environment" (*id.* at p. 126) in violation of the Fair Employment and Housing Act (FEHA). (Gov. Code, § 12900 et seq.) In essence, the court has recognized the FEHA exception to the First Amendment.

In *Meritor Savings Bank* v. *Vinson* (1986) 477 U.S. 57 [106 S.Ct. 2399, 91 L.Ed.2d 49] (*Meritor*), the United States Supreme Court held that a "hostile environment" could constitute workplace sex discrimination in violation of title VII of the Civil Rights Act of 1964 (Title VII). (*Meritor, supra,* 477 U.S. at pp. 66, 73 [106 S.Ct. at pp. 2405-2408].) Specifically, the high court held that a plaintiff need not suffer " 'tangible loss' of 'an economic character,' " as distinguished from " 'purely psychological aspects of the workplace environment,' " in order to recover under Title VII. (*Meritor, supra,* 477 U.S. at p. 64 [106 S.Ct. at p. 2404].) In support of its holding, the court cited with approval the Equal Employment Opportunity Commission's guidelines on discrimination because of sex, which defined unlawful "sexual harassment" as including " 'verbal . . . conduct of a sexual nature.' . . . [having] 'the purpose or effect of . . . creating an intimidating, hostile, or offensive working environment.' " (*Id.* at p. 65 [106 S.Ct. at pp. 2404-2405].)

In *Harris* v. *Forklift Systems, Inc.* (1993) 510 U.S. 17 [114 S.Ct. 367, 126 L.Ed.2d 295] (*Harris*), the court reaffirmed and refined its holding in *Meritor.* The court held that a discriminatory environment need not cause "concrete psychological harm" to violate Title VII; rather, it need only "reasonably be perceived . . . as hostile or abusive." (*Id.* at p. 22 [114 S.Ct. at p. 371].) More important, in *Harris,* unlike *Meritor,* the only conduct that was at issue was offensive speech. Thus, in *Harris* (and in dictum in

*Meritor*), the high court recognized what is in essence the statutory tort of injurious speech. How does that holding reconcile with the court's statement just a few years earlier in *Hustler Magazine* v. *Falwell* (1988) 485 U.S. 46 [108 S.Ct. 876, 99 L.Ed.2d 41], reaffirming its "longstanding refusal to allow damages to be awarded because . . . speech . . . may have an adverse emotional impact on the audience"? (*Id.* at p. 55 [108 S.Ct. at p. 882].) The residents of Skokie, Illinois—some of whom had survived the horrors of the Holocaust in Europe only to face similar hatred on the streets of America— must have learned about *Meritor* and *Harris* and wondered why hostile and offensive speech is remediable in the often rough-and-tumble environment of the workplace, but not on the streets and sidewalks of our neighborhoods. (See *Rowan* v. *Post Office Dept.* (1970) 397 U.S. 728, 738 [90 S.Ct. 1484, 1491, 25 L.Ed.2d 736] [upholding a statute protecting people from objectionable speech in the places where they live].) A constitutional scholar would answer that the high court has never addressed whether Title VII's ban on "offensive" " 'verbal . . . conduct' " in the workplace is consistent with the First Amendment. (*Meritor, supra*, 477 U.S. at p. 65 [106 S.Ct. at p. 2404].) Nevertheless, the plurality opinion assumes the high court resolved that issue long ago and in favor of censorship.

The plurality notes that the FEHA has the same broad scope as Title VII, and, like Title VII, it prohibits "[v]erbal harassment" (plur. opn., *ante*, at p. 129) that is " 'sufficiently pervasive so as to . . . create an abusive working environment . . . .' " (*Id.* at p. 130, quoting *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608 [262 Cal.Rptr. 842].) Then, with an offhand summary of the holdings in *Meritor* and *Harris* and no further analysis, the plurality states that "these decisions are at least implicitly inconsistent with any suggestion that speech of this nature is constitutionally protected." (*Id.* at p. 135.) Why? These cases did not even discuss the First Amendment, let alone apply it. Finally, the plurality relies on dictum that is not even on point from *R.A.V.* v. *St. Paul* (1992) 505 U.S. 377 [112 S.Ct. 2538, 120 L.Ed.2d 305] (*R.A.V.*).

The issue in *R.A.V.* had nothing to do with Title VII or workplace discrimination. Rather, *R.A.V.* held that, even when speech falls within a category that is generally subject to regulation—such as obscenity, defamation, or fighting words—the government cannot regulate the speech in a content-based way. (*R.A.V., supra*, 505 U.S. at pp. 383-384 [112 S.Ct. at p. 2543].) "Thus, the government may proscribe libel; but it may not . . . proscrib[e] *only* libel critical of the government." (*Id.* at p. 384 [112 S.Ct. at p. 2543].) Similarly, the government may proscribe fighting words, but it may not proscribe only those fighting words that "provoke violence 'on the basis of race, color, creed, religion or gender.' " (*Id.* at p. 391 [112 S.Ct. at

p. 2547].) In dictum elaborating on this point, the court noted that this content-neutrality requirement is less strict in the case of fighting words and similar "proscribable speech" than in the case of "fully protected speech." (*Id.* at p. 387 [112 S.Ct. at p. 2545].) As an example, the court noted, expressly without deciding, that "sexually derogatory 'fighting words,' among other words, *may*" violate Title VII, though this regulation of only those fighting words that are "sexually derogatory" is obviously not content-neutral. (*Id.* at p. 389 [112 S.Ct. at p. 2546], italics added.)

This tentative dictum is hardly a "ruling[]" (plur. opn., *ante*, at p. 137) that "leave[s] little room for doubt" (*id.* at p. 136), and, in any case, it is clearly limited to "proscribable speech" such as fighting words. Indeed, if it were not so limited, it would fail to illustrate the high court's point, which is that the content-neutrality requirement applies less strictly in the case of "proscribable speech." As such, this dictum can hardly be characterized as a definitive determination that the First Amendment does not protect speech that creates a hostile work environment. On the contrary, *R.A.V.* emphasizes that the content-neutral requirement is more strict in the case of "fully protected speech." (*R.A.V.*, *supra*, 505 U.S. at p. 387 [112 S.Ct. at p. 2545].) Thus, if anything, *R.A.V.* suggests Title VII's content-based regulation of speech is invalid to the extent it regulates "fully protected speech" like the speech at issue here. In other words, if the ordinance at issue in *R.A.V.* was unconstitutional because it singled out for regulation only those fighting words that "provoke[d] violence 'on the basis of race, color, creed, religion or gender' " (*R.A.V.*, *supra*, 505 U.S. at p. 391 [112 S.Ct. at p. 2547]), then a fortiori Title VII is unconstitutional because it is a content-based regulation of speech *not* limited to fighting words.

I can think of no circumstance in which this court has brushed aside such an important constitutional protection as the right to free speech on the basis of so little analysis or authority. And it is no answer that the government is merely proscribing discriminatory conduct, whether or not spoken words are an integral part of that conduct, and therefore it can incidentally regulate speech in the workplace without violating the First Amendment. (Plur. opn., *ante*, at pp. 134-135, 137, fn. 6.) Here, it is the speaker's philosophical beliefs and opinions themselves that cause the injury, and it is those beliefs and opinions that the government wants to censor. If government can censor those beliefs and opinions under the rubric of merely proscribing discriminatory conduct, then it can also punish Father Terminiello for discriminatorily denouncing Russian Jews in his speech in a Chicago auditorium, and it can punish Clarence Brandenburg for advocating the deportation of Blacks, and it can prevent Nazis from marching through the streets of Skokie.

Indeed, if applied generally, the plurality's rule would create the exception that swallowed the First Amendment. As part of the FEHA, the Legislature

has also attempted to address the problem of discrimination in our neighborhoods by regulating residential real estate transactions. (Gov. Code, § 12955.) If, in furtherance of this goal, the Legislature had enacted a prohibition against "verbal conduct" creating a "hostile sidewalk environment" analogous to the similar prohibition that applies in the workplace, courts could then enjoin speeches and parades that express discriminatory ideas, and under the plurality's open-ended standard, these injunctions would be constitutional because they merely proscribed discriminatory conduct with only an incidental effect on speech. The plurality simply has not explained what makes the workplace different from all the other places where we have to put up with hateful and discriminatory speech.

Moreover, here we are not dealing merely with a regulation of speech, we are dealing with an absolute prohibition—a prior restraint. Prior restraints of speech are particularly inimical because they do not merely place a burden on the speaker's ability to communicate a message; rather they erase that message before its effects can be assessed. The plurality repeatedly asserts that the prior restraint at issue here is permitted under the First Amendment "because defendants simply were enjoined from continuing a course of repetitive speech that had been judicially determined to constitute unlawful harassment in violation of the FEHA." (Plur. opn., *ante*, at p. 145; see also *id.* at pp. 126, 140-141, 141-142, 147.) So speech that is "unlawful" is now unprotected by the state and federal Constitutions. That standard turns the world on its head. In effect, the plurality says, "The Legislature, acting in response to current popular sentiments, has carved out certain ideas from the universe of ideas and declared them to be bad ideas, and once an idea has been judicially determined to be one of these bad ideas, courts can prohibit anyone from expressing it." I disagree.

Justice Werdegar's concurring opinion, though it agrees the court's analysis is fatally flawed (conc. opn., *ante*, at pp. 149-150) and tries harder to address the First Amendment issues, is no more persuasive. Conceding that none of the existing First Amendment doctrines standing alone permits the injunction at issue here, she carves a new exception from the First Amendment because a "contrary holding" (*id.* at p. 165) would mean "Lawrence's First Amendment rights . . . outweigh the rights of the Latino plaintiffs to be free of unwanted racial discrimination." (*Id.* at pp. 165-166.)

The Constitution, however, has already balanced the scales. Plaintiffs should not be subjected to racial invectives in the workplace. But this case is not, as Justice Werdegar suggests, an all-or-nothing choice between either upholding the injunction or subjecting employees to a "constant stream of [denigrating] verbiage." (Conc. opn., *ante*, at p. 165, fn. omitted.) There is a

middle ground: employees can sue and recover damages. It is hard to imagine any employer would continue to tolerate discriminatory speech in the workplace after shouldering the cost of litigation and a damage award, and, if it did, it would run the risk of paying a second award, including hefty punitive damages and attorney fees. I think that remedy is sufficient to deter any "unwanted racial discrimination." (*Id.* at p. 166.)

As Justice Werdegar recognizes, this case pits freedom of speech against racial equality, and because the tension between freedom and equality cannot be reconciled, the best that can be achieved is a rough equilibrium. (Conc. opn., *ante*, at pp. 165, 167.) In this regard, the California Constitution strikes the appropriate balance by distinguishing between prior restraints and all other regulations of speech. Article I, section 2, subdivision (a), of the state Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." In *Dailey* v. *Superior Court* (1896) 112 Cal. 94, 97 [44 P. 458] (*Dailey*), discussing an earlier, almost identical version of this provision, we said, "The right of the citizen to freely speak, write, and publish his sentiments is unlimited, but he is responsible at the hands of the law for an abuse of that right. He shall have no censor over him to whom he must apply for permission to speak, write, or publish, but he shall be held accountable to the law for what he speaks, what he writes, and what he publishes. It is patent that this right to speak, write, and publish, cannot be abused until it is exercised, and before it is exercised there can be no responsibility."

Since *Dailey*, we have upheld injunctions against speech, but only proscribable speech such as obscenity or fighting words, or where other compelling circumstances made injunctive relief absolutely necessary. (Cf. *People* ex rel. *Gallo* v. *Acuna* (1996) 14 Cal.4th 1090 [60 Cal.Rptr.2d 277, 929 P.2d 596].) No such circumstances exist here, where the speaker has merely expressed disgusting opinions and may well have ceased doing so. Forcibly prohibiting expression may only reinforce the animosities we are trying to subvert. In permitting speech, but requiring the speaker to pay damages for injurious speech, the California Constitution preserves both the freedom of the speaker and the equal dignity of the audience. This compromise not only discourages injurious speech, but may also foster positive change in the speaker's attitudes. Accordingly, I would draw the line in the same place as the California Constitution and find the injunction at issue here to be an unconstitutional prior restraint of speech.

The court also rejects defendants' argument that the injunction here is overly broad. Justice Werdegar's concurring opinion does not address this

issue other than to state that the injunction must be "sufficiently narrowed on remand to apply to the workplace only." (Conc. opn., *ante*, at p. 166.) The plurality opinion recognizes that an injunction restraining speech must "burden no more speech than necessary to serve a significant government interest" (*Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753, 765 [114 S.Ct. 2516, 2525, 129 L.Ed.2d 593]), but argues that this injunction satisfies that standard. (Plur. opn., *ante*, at p. 146.) I disagree.

First, because we are deciding this case on a very limited record, we do not know what exactly plaintiffs' supervisor said, how often he said it, or what the surrounding circumstances were. Moreover, we do not know whether the damages award, which defendants have chosen not to challenge, was adequate to bring an end to the conduct that created the hostile work environment. Therefore, we do not know if the broad injunction was necessary, or if a more specific one prohibiting, for example, only pervasive use of certain epithets would have sufficed. Second, the injunction does not merely prohibit plaintiffs' supervisor from repeating his discriminatory comments in plaintiffs' presence; rather, it prohibits him from repeating them anywhere in the workplace. The United States Supreme Court made clear in *Harris* that, "if the victim does not subjectively perceive the [work] environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." (*Harris, supra*, 510 U.S. at pp. 21-22 [114 S.Ct. at p. 370].) This standard also applies under the FEHA. (Plur. opn., *ante*, at p. 130.) Therefore, if an employee never learns about the use of certain words in the workplace, those words cannot create a hostile work environment for that employee. I see no reason under this standard to enjoin plaintiffs' supervisor from expressing his discriminatory opinions to persons in the workplace who are not offended by them. In sum, even if the injunction at issue here were otherwise constitutional, it is overly broad as written and therefore invalid.

Every age has its fashionable ideas and its disfavored ideas. In the early part of this century, the public was particularly thin-skinned about communism. Courts tried to prohibit and punish the dissemination of communist ideas, but the United States Supreme Court struck down these decisions with a resounding no. (See, e.g., *Gitlow v. New York* (1925) 268 U.S. 652 [45 S.Ct. 625, 69 L.Ed. 1138].) Justice Holmes added the phrase "free trade in ideas" to our judicial lexicon and admonished us that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." (*Abrams v. United States, supra*, 250 U.S. at p. 630 [40 S.Ct. at p. 22] (dis. opn. of Holmes, J.).) In other words, the only way to fight a bad idea is with a good idea. But today this court reopens the door to censorship with a resounding yes. The Legislature is now free to prohibit the

expression of ideas it dislikes, and courts can enforce these prohibitions with injunctions.

None of us on this court condone ethnic and racial discrimination in the workplace, but the issue in this case is speech, not just discrimination. Speech is unpleasant sometimes. It may be disgusting. It may be offensive. Contrary to the nursery rhyme, it may even be injurious. But, with few exceptions, none of which apply, the state and federal Constitutions prohibit courts from using their injunctive power as a surgical instrument to extricate disfavored ideas from the popular discourse, and this principle applies even here where the ideas in question were, from what we can tell from the limited record, both offensive and abhorrent.

One of the truths we hold to be self-evident is that a government that tells its citizens what they may *say* will soon be dictating what they may *think*. But in a country that puts such a high premium on freedom, we cannot allow ourselves to be the captives of orthodox, culturally imposed thinking patterns. Indeed, I can conceive no imprisonment so complete, no subjugation so absolute, no debasement so abject as the enslavement of the mind.

Fundamentally, this is a case about equality and freedom. Thus, it is a case about our most basic political ideals; about our highest aspirations and our greatest failures; our toughest challenges and our deepest fears. It is about a bafflingly elusive dream of equality and the freedom, not immune from abuse, to speak words that make others more than uncomfortable. It is a case about equality and freedom and the irreconcilable tension between the two. We are all the beneficiaries of the freedom the Constitution guarantees, and we all pay its costs, even though the price may sometimes be anguish.

I dissent.